BOARD OF EDUCATION OF SCHOOL DISTRICT No. 68, Du Page County, Plaintiff-Appellant, *v.* SURETY DEVELOPERS, INC., Defendant-Appellee.

(No. 72-388;

Second District—December 16, 1974.

*Rehearing denied January 8, 1975.*

G. Kent Yowell, of Northbrook, for appellant.

Marks, Marks, & Kaplan, of Chicago (William S. Kaplan, and Robert Marks, of counsel), for appellee.

Mr. PRESIDING JUSTICE THOMAS J. MORAN delivered the opinion of the court:

Plaintiff brought this action to collect damages for breach of a written contract entered into by the parties; the defendant filed a counterclaim. After a bench trial, the court entered judgments in favor of the defendant on both the complaint and the counterclaim. Plaintiff appeals contending that the trial court erred in finding that (1) the original agreement of March 24, 1959, and the later contract of February 15, 1960, were illegal, and (2) that defendant entered the contracts under duress.

Early in 1958, the defendant acquired about 300 acres of land with an option to purchase an additional 165 acres. (The unimproved, unsubdivided property was located in an unincorporated area and surrounded by farm land.) The purchase price of the 465 acres was approximately $500,000.

It was defendant's original intent to divide the land into parcels of 1 or more acres, to service the lots with individual septic fields and wells,

and to sell the vacant lots so improved. The Du Page County Health Department, however, advised defendant that seepage tests showed the land unsuitable for individual septic fields and that the only alternative would be the installation of a community sewage-treatment plant. The department also informed defendant that if additional seepage tests at greater depths proved satisfactory, they would reconsider their decision.

Instead of making additional tests, the defendant instituted an alternate plan to divide the land into lots of less than 1 acre, to build homes, and to install a community sewage-treatment plant and water facilities. The land, however, was zoned residential (R-2) and, under that zoning, community sewage and water systems were permissible only by the granting of special-use permits from the County Board of Supervisors (Board). It is noted that without Board approval no plat could be recorded (Ill. Rev. Stat. 1957, ch. 109, § 2); thus, defendant's alternate plan depended upon approval of its applications for special-use permits.

Defendant filed applications for special-use permits to build a permanent community sewage-treatment plant, two temporary sewage-treatment plants, two permanent well sites, and a permanent water tower. On July 31, 1958, the County Zoning Board of Appeals held a public hearing to consider the special-use applications. The majority of the approximately 150 persons in attendance opposed the request on the grounds that the school could not handle the projected increase in enrollment,[1] that traffic and police problems would be created and that the value of adjoining property would be lowered.

The Zoning Board of Appeals, by letter to the Board, recommended denial of the special-use applications with the following findings:

"The Board finds that permitting the issuance of these Special Use Permits will allow the petitioner to reduce the frontage of his lots from 180 feet to 90 feet and to reduce them in area from 1 acre to 12,000 square feet, as provided under R-2-Single Family Residence District regulations. * * * The Board is unanimously of the opinion that the issuance of these Special Use Permits will allow a subdivision development that is entirely out of character with the uses of adjacent and adjoining property and which would tend to diminish their property values, add to the hazards on the public streets and highways and place a considerable burden on the country school which serves the area. * * *"

The defendant thereafter undertook a program of discussing his prob-

---

[1] Plaintiff's school district in 1958 had only one school which was more than a mile from the proposed development. The school had five classrooms and a total enrollment of 97 students in the 1958-59 school year.

lem with as many of the Board members as possible. In addition, defendant, knowing that the recommendation would go before the Building and Zoning Committee (who then would make their recommendations to the Board), asked for and was granted a hearing before the Committee. The defendant at this time attempted to negotiate with the plaintiff but plaintiff would not meet with defendant.

On August 19, 1958, after meeting with the Committee and in response to its concern regarding schools, the defendant, by letter to the Committee, stated in part:

"Insofar as our development will create the need for additional class room facilities in the Goodrich School District, it is our intent to be cooperative with those needs. We therefore agree to the following:

1. We will furnish houses as temporary school facilities at a minimum rental to the School Board, if required, until permanent school facilities can be erected.

2. We will furnish the ground, build a permanent school facility and lease same to the Goodrich School District at a nominal rental of $1.00 per year for a period not to exceed five years, the School Board to purchase said facilities prior to the expiration of the rental term at 80% of the total cost of the facilities."

The Board accepted the defendant's offer and granted three of the four requested special uses, denying only the requested operation of the temporary sewage-treatment plants. Each of the special-use permits contained a condition taken verbatim from defendant's letter to the Committee. The Board also on this date approved defendant's plat of subdivision which was recorded, and subsequently, defendant's other plats were approved and recorded.

The defendant commenced construction, including contracting for installation of the permanent sewage-treatment plant, waterworks, and connecting pipelines. It planned to build houses that would sell in the $14,000 to $17,000 range, with Federal Housing Administration (F.H.A.) and Veterans Administration (V.A.) backing. Pursuant to this plan, the defendant, in early September, 1958, sent letters to the V.A. seeking their approval, which approval was to take the form of the agency's guarantee of private financing.

By September 13, 1958, the defendant, having submitted all forms required by the V.A., believed that approval was forthcoming, and started an advertising campaign in a Chicago newspaper that included a reference to veteran benefits and to available schools. The V.A. at this time had a policy of including, as a special condition to approval, matter that a builder advertised as part of its development.

Sometime after the first ad appeared, the plaintiff's representatives met with V.A. representatives to complain that defendant's development was in a virgin area and that the development would place a tremendous burden on the present school system which was rather small. On October 20, 1958, the plaintiff's attorney wrote a letter to defendant seeking a meeting to work out an agreement between plaintiff and defendant. The next day, defendant replied by a letter wherein he agreed to meet with the plaintiff to discuss and review various proposals.

On November 14, 1958, the V.A. wrote a letter informing defendant that they were aware of the inadequacy of the existing school facilities, that it was defendant's responsibility to make arrangements to assure that the nonexistent school facilities would be provided as a condition precedent to V.A. approval of subdivision plans and that it was of prime concern to the V.A. that availability of necessary schools be assumed as a condition precedent to sale of houses to veterans. In reply, defendant wrote letters which stated that defendant had, since the inception of the project, taken steps to insure adequate schools; had met with plaintiff a number of times; had agreed to provide both temporary and permanent school facilities; was enclosing the resolution of the Board outlining this agreement; and was presently meeting with plaintiff to draw up a formal agreement. Additionally, the letters requested that the V.A. grant defendant conditional approval with the understanding that no veteran loans would be closed until plaintiff and defendant had signed an agreement.

On December 12, 1958, the V.A. issued the conditional approval requested. On March 24, 1959, plaintiff and defendant signed the first agreement.

The agreement provided the specific details for both the temporary and permanent school facilities to be made available by the defendant. In substance, the terms of the agreement were the same as the conditions of the special-use permits. Plaintiff notified the V.A. of the agreement and the condition was deleted from the V.A.'s approval.

Thereafter, defendant began to experience difficulties performing under the agreement and "felt it was a very bad deal." On November 18, 1959, defendant's attorney, in a letter to plaintiff, sought to cancel the agreement and proposed an alternative plan. By reply letter, plaintiff informed defendant that they thought it would be best for defendant to perform under the March 24 agreement. Defendant did not respond and, on December 8, 1959, plaintiff again wrote defendant seeking compliance with the agreement. On December 16, 1959, defendant, by letter, requested that plaintiff deal through defendant's attorney. Pursuant to a

conversation with plaintiff, defendant's attorney, on January 20, 1960, offered two alternative plans in lieu of the March 24 agreement.

On February 15, 1960, plaintiff and defendant entered into a new agreement wherein defendant agreed to donate to plaintiff certain land with improvements (stipulated value $35,000), to pay plaintiff $50,000 as an initial contribution toward the construction of the permanent school and $200 for each home thereafter constructed and occupied in the subdivision. Plaintiff, for its part, agreed to erect a school building on the site, to request the voters to approve a bond issue and to cancel the March 24 agreement when the initial deposit was made by defendant.

Defendant thereafter conveyed the real estate to plaintiff, made the initial contribution, and completed the agreed-to improvements. After receiving voter approval, plaintiff issued bonds totaling $140,000 and erected the school at a total cost of approximately $288,000.[2]

Subsequent to the new agreement, defendant built 1030 homes (during which time its advertising stated that $200 per home was to be donated to cover the cost of the new school facilities), but failed and refused to make the per lot payments to the plaintiff. Plaintiff brought this action to collect under the terms of the second contract. Defendant denied owing plaintiff anything, asserting that both contracts were unenforceable by reason of illegality and duress, and it counterclaimed for the value of the land, $35,000 and the $50,000 contribution. The trial court entered judgments in favor of the defendant on both the complaint and the counterclaim, awarding defendant $85,000.

The trial court, in reaching its decision, relied upon *Pioneer Trust & Savings Bank v. Village of Mount Prospect*, 22 Ill.2d 375 (1961), and *Rosen v. Village of Downers Grove*, 19 Ill.2d 448 (1960), and held invalid the conditions contained in the special-use permits with the result that the contracts between plaintiff and defendant were rendered illegal. We conclude the facts in these cases are distinguishable from the instant case.

*Pioneer* involved a portion of a village ordinance that required the dedication of land for public use as one of the conditions precedent to plat approval of a subdivision. The subdivider satisfied all other conditions but refused to make the dedication and, by mandamus, sought to compel the village to approve its plat. The supreme court found for the subdivider and held the contested portion of the village ordinance in-

---

[2] The school was completed in 1961. At the time of trial, January 1972, only 25 to 35 of the 1400 students who attended the schools in plaintiff's district lived outside the development.

valid. The court stated that the school facilities were at near-capacity as a result of the total development of the community, not because of the subdivider's proposed plan, and reasoned that where the public need for the land was not specifically and uniquely attributable to the proposed subdivision, the dedication would constitute a taking of private property for public use without just compensation. There was no contract at issue in *Pioneer*.

The *Rosen* case was a class action involving a portion of a village ordinance which required that, prior to plat approval, the subdivider must dedicate land for educational purposes. It further required that if the plan commission should deem that the proposed dedication of land would not of itself meet the reasonable requirement of providing educational facilities for the proposed subdivision, then the plan commission might require any additional means for providing the same. Acting in reliance on this ordinance, the plan commission required the subdivider to receive a certificate of approval from the local boards of education as a condition precedent to plat approval. In order to receive such certificate, some subdividers were required to pay certain sums per lot to the local boards of education for educational purposes. The court found that the technique of requiring per lot payments for educational purposes was not authorized by the enabling State statute; that the requirement of a certificate of approval from the boards of education was also without enabling legislation and amounted to an abdication of authority by the plan commission; and that the ordinance, in providing for "educational purposes," was broader than the language of the enabling statute and also without standards to govern the plan commission in determining the amount of land to be dedicated. On this basis the court held the portion of the ordinance invalid.

The court, however, did not hold that all payments made to the local boards of education by members of the class should be returned pursuant to its findings of invalidity, but specifically found that the payments made by one of the members of the class (Firestone) were made under duress and thereby refundable. Too, in finding that the action was properly brought as a class suit, the court noted that subsequent proceedings may reveal the existence of some subdividers who made voluntary payments to the boards of education.

In *Board of Education v. Herzog Construction Co.*, 29 Ill.App.2d 138, 142 (1961), the court allowed the plaintiff-board to recover funds promised to it by the defendant-developer pursuant to a written agreement, stating that *Rosen* "supports the plaintiff in its contention that the Board of Education is authorized to enter into voluntary agreements

with subdividers to accept payments to help defray the cost of erecting school buildings."

■■ Therefore, even assuming *arguendo* that the conditions of the special-use permits are invalid, there is nothing in *Rosen* or *Pioneer* which requires that the contracts between the parties be *ipso facto* found illegal. In order for a contract to be deemed illegal it must expressly contravene the law or known public policy. (*Gowdy v. Richter*, 20 Ill.App.3d 514, 525 (1974).) There is no known law or public policy that makes it illegal for boards of education and developers to enter into contracts that help defray the cost of constructing educational facilities. On the contrary, the law is clear that this type of agreement is enforceable even in the face of an invalid ordinance, if the agreement was the voluntary act of the parties. We therefore find the trial court in error for holding the contracts illegal.

■■ In addition to finding these contracts illegal, the trial court also found them unenforceable by reason of duress. The finding of duress was based upon two premises: (1) the conditions of the special-use permits forced the defendant to negotiate the contracts with the plaintiff; and (2) the plaintiff induced the V.A. to condition its financing upon defendant's entering into an agreement with plaintiff. These findings raise the central and controlling inquiry in the present cause. Were these contracts entered into voluntarily or were they entered into under duress? It is plaintiff's position that the finding of duress was against the manifest weight of the evidence.

As stated in *Stoltze v. Stoltze*, 393 Ill. 433, 442 (1946):

> "Duress has been universally defined as a condition which exists where one is induced by the unlawful act of another to make a contract * * * under circumstances which will deprive him of the exercise of his free will. There must be such compulsion affecting the mind as shows that the execution of the contract * * * was not the voluntary act of the maker. Such compulsion must be present and operate at the time the instrument was executed. The burden of proving such duress is on the person asserting it."

Further, in *People ex rel. Drury v. Catholic Home Bureau*, 34 Ill.2d 84, 93 (1966):

> "Mere advice, argument or persuasion does not constitute duress * * * if the individual acts freely when he executed the questioned documents though the same would not have been executed except for the advice, argument or persuasion."

The facts presented in the present cause reveal that the defendant's

land was zoned R-2. Under this zoning, defendant could have built his proposed subdivision on lots with an area of 12,000 square feet without special-use permits if public sewer and water facilities were available. The unavailability of such facilities made it necessary for defendant to apply for special-use permits and this in turn brought to light the community's objections to the proposed subdivision.

These objections resulted in the Zoning Board of Appeal's unanimous rejection of the defendant's special-use applications. Final action, however, remained a question for the Board. The Board, in making its decision, was required by law to weigh the desirability of the proposed use against its adverse impact. (*Kotrich v. County of Du Page,* 19 Ill.2d 181, 186-87 (1960).) Under this test, the defendant's applications faced possible denial on the weight of the development's adverse impact.

Perhaps anticipating this result, but without regard to it, defendant on its own initiative and without prior contact from the Board, sought out members of the Board, individually and in committee. (The defendant also sought, but was denied, a meeting with the plaintiff.) The purpose of these meetings was to make the development more desirable, to lessen its adverse impact, and to thereby tip the scales in favor of approval. The plan worked. The defendant's special-use applications were approved without the plaintiff ever participating. Unlike the facts in *Rosen* and *Pioneer,* here, it was the developer, not the Board, who initiated the action that led to the conditions requiring the donation of school facilities; the area effected was undeveloped; and the school problem created was one specifically and uniquely attributable to defendant's proposed development.

Further evidence of the voluntary nature of defendant's action is revealed in a letter to the V.A. (November 17, 1958) wherein defendant states:

"* * * We have taken steps since the inception of this development to adequately provide proper school facilities to those who purchase homes in the subdivision. * * *"

There is absolutely no evidence that the Board *forced* the defendant into providing school facilities. If defendant had believed the Board's actions to be unauthorized by statute, it could have brought a mandamus action (as in *Pioneer*) or satisfied the condition under protest and sought legal recourse (as in *Rosen*). Neither procedure was followed. The record indicates that at no time did defendant directly challenge the Board's authority to impose the conditions. To the contrary, after approval, the defendant advertised available schools as a selling point for his development.

The trial court found that:

> "The condition precedent in the Special Use was fatal to plaintiff's cause, for defendant was forced thereby to negotiate two contracts with the plaintiff, the second of which is the subject matter of this suit. * * *"

This finding belies the evidence. A reading of the conditions clearly reveals that no agreement between plaintiff and defendant was required as a condition precedent or condition subsequent to approval of the permits. Defendant has offered no evidence to support a finding that the Board otherwise required the defendant to enter into an agreement with the plaintiff, or that the Board invested the plaintiff with any authority to control the actions of the defendant. The Board took no part in the negotiations between the parties herein. The defendant was required to comply with the requirements of the conditions, regardless of plaintiff's desires. Noncompliance would necessitate action by the Board, not the plaintiff. Any problem defendant encountered could have been presented to the Board.

Duress is a state of mind wherein the circumstances are such that the party is deprived of his exercise of free will. The burden is on the complaining party to prove duress. The defendant has failed to meet its burden of proof.

The facts reveal that the defendant did not enter into the first contract with the plaintiff until after such an agreement became a condition precedent to final V.A. loan approval. The second contract was initiated at defendant's urging and while the plaintiff at first refused, it later relented under the persistence of defendant and executed the second contract drawn in defendant's terms. This later agreement stated:

> "* * * Further, that [defendant] is entering into the undertakings and commitments hereunder on a wholly voluntary basis, without duress, and with the advice of it legal counsel."

The trial court found that:

> "* * * The conclusion is inescapable that plaintiff successfully induced the Veteran's Administration to condition its financing upon defendant's willingness to furnish a school for plaintiff. * * * Clearly, this constituted duress."

■■ There is no evidence that the plaintiff committed any unlawful act by informing the V.A. of the existing school situation, nor is there evidence that the plaintiff had any control, whatsoever, over the actions of the V.A. The acts reveal that it was the defendant who, in a letter to the V.A., first proposed that its final loan approval be conditioned on an agreement with the plaintiff. In return, the defendant wanted interim

loan approval from the V.A. The V.A. did no more than accept the defendant's offer. There is no evidence to support the finding that the V.A. or the plaintiff forced the defendant to make this proposal or that the proposal was not the voluntary act of the defendant. On the contrary, the evidence discloses that plaintiff and the V.A. expected defendant to abide by what it had promised in its advertisements and in obtaining the special-use permits. Under these facts, finding duress in the action of the V.A. is without supporting evidence.

For the reasons stated, we conclude that the trial court erred in holding that the contracts were illegal and that they were entered into under duress. The judgments, therefore, are reversed and the case is remanded for further proceedings.

Judgments reversed; cause remanded.

SEIDENFELD and RECHENMACHER, JJ., concur.