(No. 39398.—

THE PEOPLE *ex rel.* MARILYN DRURY, Appellant, *vs.* CATHOLIC HOME BUREAU, Appellee.

*Opinion filed January 25, 1966.*

Francis J. Mahon, of Chicago, for appellant.

Isham, Lincoln & Beale, of Chicago, (Robert W. Cronin and Peter A. Tomei, of counsel,) for appellee.

Mr. Justice Underwood delivered the opinion of the court:

Marilyn Drury instituted this *habeas corpus* action in the Cook County circuit court against the Catholic Home Bureau, a corporate child placement agency licensed by the State of Illinois and operating under the auspices of the Catholic Charities of the Archdiocese of Chicago. Petitioner's objective was to regain custody of her infant son previously surrendered by her to the agency for adoptive placement. Petitioner's appeal comes directly here (Const. of Illinois, art. VI, sec. 5) from a final judgment finding the surrender to have been voluntarily made and from an order denying a petition to vacate this judgment in order that newly discovered evidence might be considered.

The principal argument is that the trial court's finding as to the absence of duress is against the manifest weight of the evidence, and that petitioner was incapable of forming any considered judgment as to whether she should surrender her child to an adoption agency. Resolution of the questions requires a review of the evidence.

Petitioner was shown to be a 28-year-old unmarried graduate of the University of Chicago. She had done postgraduate study at Roosevelt University and taught in the Chicago Public schools. A prior pregnancy in 1962 had been terminated by abortion. Her father died when she was 20, leaving a still intact estate approximating a half-million dollars. Her mother remarried. Petitioner is the only living child, an older brother having been killed when she was 14.

In the fall of 1963 petitioner was examined by Dr. Abraham Jackman who filed a certificate stating she was mentally ill, and her mother filed a petition for her commitment. She was, by an October 16th order of the county court of Cook County, committed as mentally ill to the Department of Mental Health and admitted to the Illinois State Psychiatric Institute in Chicago, the diagnosis of the court-appointed commission then being "schizophrenic reaction, manifested by hostile and belligerent behavior— delusional paranoid, no insight." Prior to this commitment

she had been privately hospitalized for treatment of her mental difficulties, but the record does not disclose the dates nor extent of such hospitalization. The characteristics of her mental condition were shown to involve wide swings between elation and depression, interfering with her thought processes and functioning, coupled with suspiciousness of other people.

Apparently, internes and staff members from other hospitals were assigned to the Institute as part of their training. Dr. F. T. Reid, Jr., a psychiatrist, was director of the representatives of Michael Reese Hospital at the Institute. Miss Drury was under the immediate care of Dr. Harvey Freed, a resident in psychiatry at Michael Reese Hospital, who spent six months at the Institute. Marcellina Reich, a psychiatric social worker, was also assigned to her case. Petitioner's suspicions that she was pregnant were confirmed shortly after her admission. At the time of her commitment she had been dating Eugene Brill, to whom she was apparently engaged, but she was uncertain as to whether he had fathered the child with which she was pregnant.

During November the Institute staff, Drs. Freed and Reid and Miss Reich discussed petitioner's case and determined it would be best for her to place the baby for adoption, and in December Drs. Freed and Reid and Miss Reich discussed this plan with petitioner's mother and step-father, the Haleys, who agreed. Petitioner was then told of the plan, became angry and refused to consent. Thereafter the Haleys went to Florida, remaining there until April. Later in December the hospital staff decided Miss Drury should make her own decision about the child's future, and that Dr. Freed would discuss this with her.

Petitioner was permitted to date Brill during December, and did so once or twice a week, many of these dates occurring outside the hospital. His testimony indicates that, for some unexplained reason, he told her about March 1, 1964, that he would be willing to adopt the child if they

married, but only if it were first placed for adoption and then taken back six or eight months later. She told him that plan was not workable. After talking to Dr. Freed and Miss Reich, he told petitioner he thought it best to place the child for adoption. Petitioner discussed her problems with Dr. Freed twice each week, and in March Miss Reich and petitioner discussed contacting several child-placement agencies regarding assistance with petitioner's problems. Petitioner wrote to one agency herself. Several agencies refused to co-operate because of the mother's hospitalization, but an appointment was made by Miss Reich at petitioner's request with respondent agency, and petitioner, on April 3, was taken at her own request by an agency caseworker to stay with a private family in Lake Zurich, having received a conditional discharge from the hospital as improved. At this time petitioner told her mother she was probably going to place the baby for adoption.

Several weeks later petitioner left this home. Her mother and step-father refused to permit her to stay at their home, and she moved to the Sherman Hotel in Chicago. On May 8 petitioner entered St. Vincent's Infant and Maternity Hospital in Chicago and stayed there until just before the birth of her child when she was taken to St. Joseph's Hospital. Throughout this entire period it is established that petitioner conferred regularly with Dr. Freed and discussed the problems related to the future plans for the baby. She also discussed these problems with her social worker, the agency worker, her mother, stepfather, and fiance. She was uncertain as to what she should do, wanting to keep the child but simultaneously realizing that she was not living in a social vacuum, that many people objected to her doing so, and that perhaps it would be best to surrender the youngster for adoption. She talked with Miss Josephine Murphy of the Catholic Home Bureau, was advised as to the several types of child care, including the foster care and adoptive placement plans, looked at the

forms relating to adoptive consent, was told such consent was irrevocable and that she would forever relinquish her parental rights and could not thereafter change her mind if she signed a consent to adoption. Miss Drury was also shown the section of the statute relating to irrevocability of adoptive consents and read it. She repeatedly stated it looked as though she would be relinquishing the child for adoption since the attitudes of her mother, step-father and fiance had not changed.

On June 7 Marilyn saw Dr. Freed as an out-patient and requested an absolute discharge which was refused. The baby was born June 17, and on June 22 an absolute discharge was issued by the Institute superintendent indicating petitioner was "without psychosis". After leaving St. Joseph's Hospital, Miss Drury went to her mother's home. Upon receiving the notice of absolute discharge the circuit court of Cook County on June 24 entered its order restoring petitioner's civil rights. She then contacted Miss Murphy, the Catholic Home Bureau caseworker with whom she had previously conferred, an appointment was made to sign the consent to adoption, and on June 30 the consent was signed by petitioner. At that time the legal effect of her action was again explained to her, and she testified she knew the nature of the documents she signed and that they were the same as the ones she had asked to see in an earlier interview. She also signed on June 30 a statement reciting she had read and understood section 11 of the Adoption Act (Ill. Rev. Stat. 1963, chap. 4, par. 9.1—11,) relating to irrevocability of consents, and that no fraud or duress was used by the Catholic Home Bureau or its agents in accepting her consent to adoption.

During the ensuing summer petitioner worked briefly at Stouffer's and for a longer period at Marshall Field and Co. At the time of the hearing in the *habeas corpus* action she was a cashier in the Palmer House Pub.

Subsequent to consenting to the adoptive placement pe-

titioner inquired of the case-worker regarding the adoptive family and as to whether the baby had been placed. She was told he had not but that a family had been selected which had already adopted two girls and now wanted a boy. The baby was placed in an adoptive home in August. In September petitioner told the agency she wanted to meet the adoptive parents and was told this was contrary to agency policy. She did not then ask to have the child returned. During September petitioner and the Haleys again saw Dr. Jackman, acting superintendent of Ridgeway Hospital, who was the physician originally certifying to her mental illness in 1963. The doctor talked to them at some length and determined that petitioner's condition was not appreciably different from when he originally saw her and that, in his opinion, she had not been mentally competent when she signed the consent to adoption nor at any time after 1963. In October a lawyer representing her called the agency, repeating the request; the agency policy was explained, and he stated he would advise petitioner to do nothing further. He did not ask for the baby's return. Mrs. Haley, petitioner's mother, testified that her daughter was so "downcast" that Mrs. Haley changed her mind and told her she would help her try to recover the child and would help her raise it. In November petitioner, who was then living at the McCormick Y.W.C.A., her mother and her counsel sought return of the baby from the Catholic Home Bureau. In December this action was instituted.

The evidence at the hearing was substantially as previously set forth except that Dr. Jackman was not called to testify nor was any claim of mental incompetency raised. In fact the only testimony relating thereto was that of Dr. Freed who was called by petitioner and testified he believed her competent to know what she was doing on June 30, that he felt she knew all of the issues and was competent to evaluate the pressures; that she knew she would like to have the baby, but had no definite plans, was not sure she would

be married, that the baby would cause problems and that under the circumstances she would be better off signing the consent for adoption; he felt it was her own decision to sign the consent. On January 21, 1965, the trial court entered its order finding the surrender to the Catholic Home Bureau to be "the free and voluntary act of Marilyn Drury and was not obtained by fraud or duress," and ordered the child to remain in the custody and control of respondent. In the trial court's oral statement of his conclusions which preceded entry of the written order he stated: "* * * There isn't any question in the Court's mind that the petitioner was very thoroughly informed with relation to what the law was both with relation to placing the child in a foster home and, also, in signing the consent to adoption. The evidence further discloses that it was apparent from both the evidence of the petitioner and those who came in contact with her during the period from her conditional discharge and her complete discharge from mental disability, that she was thoroughly conversant with what would happen in this case if she signed the consent to adoption and how she could proceed, if she wanted to proceed, by way of getting a foster home for the child. * * * I think the evidence is conclusive that she knew what she was doing. She had been advised of every aspect of the case and was conscious of the consequences that would arise by virtue of the signing of this consent."

On February 11, 1965, Dr. Jackman again saw petitioner. He found her in the same condition as in 1963, and he executed commitment papers. On February 19 the court found her mentally competent but in need of mental treatment, and committed her to the care of Francis J. Mahon, her attorney in this proceeding, who apparently arranged for her care at Ridgeway Hospital. On this same date a petition was filed in the circuit court alleging Miss Drury was incompetent and seeking vacation of the January 21 order on grounds of newly discovered evidence. At the

hearing thereon Dr. Jackman testified that he believed Miss Drury to have been incompetent from the time he saw her immediately prior to her 1963 commitment to the date of his testimony in 1965. However, he had not seen her in 1964 until September, some three months after the consent was executed, and he also stated that her condition was not permanent and that there could be periods of normalcy although "from what I can gather" he did not believe she was back to normalcy when she signed the consent. The petition to vacate was thereafter denied, the trial judge indicating he felt it to be an improper collateral attack on the June 24 restoration order which found petitioner competent at that time.

It is clear from the record of the trial court proceedings that no question of Marilyn Drury's mental competency was raised in the *habeas corpus* proceedings, and that petitioner, in fact, established her competency by the uncontradicted testimony of Dr. Freed. The only issue for resolution was the question as to whether the suggestions, advice and encouragement of petitioner's family and the professional personnel were such that it must be said that the final decision was not that of petitioner.

The applicable rules of law are not in doubt. As this Court said in *Stoltze* v. *Stoltze,* 393 Ill. 433, 442:

"Duress has been universally defined as a condition which exists where one is induced by the unlawful act of another to make a contract or perform or forego an act under circumstances which will deprive him of the exercise of his free will. There must be such compulsion affecting the mind as shows that the execution of the contract or other instrument was not the voluntary act of the maker. Such compulsion must be present and operate at the time the instrument was executed. The burden of proving such duress is on the person asserting it. *Shlensky* v. *Shlensky,* 369 Ill. 179; *Decker* v. *Decker,* 324 Ill. 457.

"Mere annoyance or vexation will not constitute duress,

but there must be such compulsion affecting the mind as shows that the execution of the contract or other instrument is not the voluntary act of the maker. *Burandt* v. *Burandt*, 318 Ill. 218; *Harris* v. *Flack*, 289 Ill. 222; *Mitchell* v. *Mitchell*, 267 Ill. 244; *Kronmeyer* v. *Buck*, 258 Ill. 586; *Huston* v. *Smith*, 248 Ill. 396; *Hintz* v. *Hintz*, 222 Ill. 248; *Dorsey* v. *Wolcott*, 173 Ill. 539; *Hagan* v. *Waldo*, 168 Ill. 646."

Mere advice, argument or persuasion does not constitute duress or undue influence if the individual acts freely when he executed the questioned documents though the same would not have been executed except for the advice, argument or persuasion. *Prontzinski* v. *Baker*, 364 Ill. 451, 455, and cases there cited.

The petitioner urges that the trial court's finding that no duress was present was against the manifest weight of the evidence. A careful review of the record not only convinces us that such is not the case, but indicates the manifest weight of the proof clearly supports the trial judge's conclusions. While petitioner claimed her consent was procured by both fraud and duress, we find no proof that any hospital staff member, doctor, caseworker, relative or friend sought to take advantage of petitioner or misrepresent facts to her. It is undisputed that her family and fiance advised her to surrender the child and that the hospital staff thought this course of action best, but it is also clear that from December, 1963, to June, 1964, her doctors and the caseworkers in their frequent discussions with her repeatedly impressed upon petitioner the fact that the decision was hers to make, explaining to her the possible plans and alternatives.

Admittedly, a mother's decision to consent to her child's adoption by a couple to her unknown must be a most difficult one to make. Strong emotional factors militate against it. Once done, misgivings not only may occur, but are probable, and it is not unlikely that attempts to rescind such

consent will be made at a time when the child has been placed in an adoptive home, and new attachments formed. The complex psychological problems inherent in situations resulting from the former procedure permitting a natural parent to withdraw a consent at any time prior to actual entry of the order of adoption (*In re Petition of Dickholtz,* 341 Ill. App. 400) with its resulting environmental instabilities for the child, were resolved in recent years by legislative action (Ill. Rev. Stat. 1963, chap. 4, par. 9.1—11,) making such consent irrevocable in the absence of fraud or duress even in instances where the consenting parent is a minor. This clear expression of public policy may not be restricted by us, and where the evidence indicates no fraud or duress was present, the consent must be held effective. We accordingly hold the trial judge's findings and judgment were not against the manifest weight of the evidence.

We come now to the propriety of the trial court's denial of petitioner's motion to vacate the order in the *habeas corpus* action on the grounds of newly discovered evidence alleged to show that petitioner was incompetent at the time of executing the consent to adoption. A summary of the statutory provisions pertinent to the competency question will be helpful.

The Mental Health Code in effect in 1963 at time of petitioner's commitment (Ill. Rev. Stat. 1963, chap. 91½, pars. 1—8 and 1—9,) defined a "mentally ill" person as one incapable of caring for and managing his own estate, whereas commitment as a person "in need of mental treatment" did not constitute an adjudication of incompetency to care for and manage one's affairs. Commitment as "mentally ill" *per se* suspended the civil rights of the person so committed, and was sufficient basis, in itself, to authorize appointment of a conservator. Ill. Rev. Stat. 1963 chap. 3, par. 113a.

The General Assembly in 1963 adopted a new Mental

Health Code, effective January 1, 1964, pursuant to which petitioner's 1965 commitment occurred. This act abolished the legal distinctions theretofore prevailing between commitments as "mentally ill" and as "in need of mental treatment" and provided that court-ordered hospitalization should not constitute an adjudication of legal incompetency nor create such a presumption (Ill. Rev. Stat. 1963, chap. 91½, par. 8—13). The cited section, however, specifically required a court ordering initial hospitalization to include in its order a finding as to competency or incompetency, and the committing court in the 1965 action found petitioner competent although in need of mental treatment.

It is axiomatic that one is presumed competent until the contrary is shown. A finding of incompetency, once made, creates a presumption that this condition continues until the contrary is shown. (*Stoltze* v. *Stoltze,* 393 Ill. 433, 443; *People* v. *Varecha,* 353 Ill. 52; *People* v. *Scott,* 326 Ill. 327.) Likewise, a restoration to one's civil rights reverses the presumption of incompetence and revitalizes the presumption of competency. *Stoltze* v. *Stoltze,* 393 Ill. 433.

The commitment of Marilyn Drury on October 16, 1963, as a mentally ill person rendered her legally incompetent, a condition presumably continuing until her restoration on June 24, 1964, following her absolute discharge as without psychosis on June 19, 1964. The restoration order reversed the situation so that she was thereafter presumably competent, a presumption to which further credence is lent by the fact that she had not actually been in the State hospital since her conditional discharge therefrom in March. Any doubt of her competency on June 30, when the consent was executed was removed by the uncontradicted testimony of Dr. Freed, the psychiatric resident with whom she had been in weekly or more frequent contact from the date of her commitment.

It is in this context that the petition to vacate the judgment must be viewed. It was filed on February 19, 1965,

two days after Miss Drury had been found competent but in need of mental treatment and committed to the custody of her present counsel who arranged for her admission to a private hospital with psychiatric facilities. The "newly discovered evidence" consisted of the opinion of Dr. Jackman who was permitted to testify that he had examined Miss Drury in September, 1964, and was of the opinion that her condition was then the same as when he last saw her just prior to her October, 1963, commitment. While admitting that there could be returns to normalcy within this period, this witness was of the opinion that Miss Drury was not competent on either occasion when he saw her nor at any time between.

It is apparent that Dr. Jackman's testimony was by no means "newly discovered". That it was known to petitioner's family and counsel at the time of the *habeas corpus* hearing is amply demonstrated by counsel's reply to the trial judge's statement in the course of Dr. Jackman's interrogation at the April 2, 1965, hearing on the petition to vacate. In addressing counsel for petitioner the court said:

"Your attempt is to show she was mentally incompetent in June, 1965 [sic], is that right?

"Mr. Mahon: That's right.

"The Court: This is totally at variance with the testimony you presented to this Court at the trial of this case. You knew about Dr. Jackman and you knew he had examined her.

"Mr. Mahon: I knew all about Dr. Jackman but I did not have to call him. At that time, in our petition we stated she was a fit and proper person to be a mother. They admitted it. There was no evidence then of whether or not she was a fit person."

Since the evidence upon which petitioner seeks to vacate the January 21 order was obviously known to her and her counsel at the time of the *habeas corpus* trial it is pertinent to consider the applicable statutory provisions. The motion

was filed pursuant to section 68.3 of the Civil Practice Act. (Ill. Rev. Stat. 1963, chap. 110, par. 68.3.) This section was designed to provide for nonjury cases a post-trial motion procedure comparable to that prescribed by section 68.1 for jury cases. A primary requisite to allowance of a motion for a new trial under section 68.1 on the grounds of newly discovered evidence is that such evidence was not discoverable prior to trial by the exercise of ordinary diligence. (*City of Chicago* v. *Pridmore,* 12 Ill.2d 447; *Leonard* v. *Jacobs,* 42 Ill. App. 2d 261.) We see no reason to distinguish between jury and nonjury cases in this regard, particularly where, as here, the evidence upon which the motion is based not only was discoverable but was actually known prior to the original trial.

We accordingly hold the trial court properly denied petitioner's motion to vacate the January 21 order and reopen the case, and the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*