KATHY O. *et al.*, Plaintiffs-Appellants, *v.* COUNSELING AND FAMILY SERVICES *et al.*, Defendants-Appellees.

Third District    No. 82-13

Opinion filed July 23, 1982.

Charles L. McNeil, of McNeil, McNeil & McNeil, of Mason City, for appellants.

Charles W. Kohr, of Mathis, Sloan, Littler & Kohr, of Peoria, for appellees.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

Fifteen-year-old Kathy O. became pregnant during her sophomore year of high school. At the suggestion of her family doctor, she became a resident of the Florence Crittendon Home in Peoria for the last four months of her pregnancy, and three days after the birth of her child, she and the child's father, Mark B., signed consents surrendering the child for adoption. About two weeks after returning home, Kathy O. contacted the agency to see if she could get her child back, and after being informed that she could not, she and Mark B. filed a *habeas corpus* petition in the circuit court of Peoria County. That petition was denied, and this appeal followed.

At the time Kathy O. became pregnant, both she and Mark B. were 15 years old and living with their respective parents. The mother of Kathy O. was shocked when she learned of the pregnancy and recommended that the baby be given up for adoption. Before Kathy O. went to Florence Crittendon Home, her mother and step-father told her that they would help her if she wanted to keep the baby but that they believed adoption would be the best thing for the baby. When Kathy O. arrived at the Home in Peoria, she informed a social worker and Lynn Ebker, her counselor from Counseling and Family Services, that she intended to give the child up for adoption. She continued to state that such was her intention throughout all her counseling sessions. Kathy O. knew that many girls did keep their babies, and in fact one section of the Home was occupied by girls with new babies who were learning parenting skills. Alternatives to adoption were mentioned to Kathy O., but she expressed no interest in

them. Lynn Ebker explained to Kathy O. that she would not be able to change her mind once she signed the consent and that the form was final and irrevocable. Kathy O. testified that when she signed she understood that she would have no rights thereafter and that she could not change her mind. Kathy O. also stated that she felt no pressure from Lynn Ebker, but did feel pressure from her mother and step-father.

Kathy O. did not tell the father of the child that she was pregnant, although her parents did inform him. She did not want to talk to him and made no effort to contact him until she had been in Peoria for several weeks. Then she talked to him during a weekend visit to her home, and thereafter they talked via telephone several times. He told her and her parents that he would stand by her and do whatever she thought best. He did not tell his parents until just before he went to Peoria to sign the papers, but he did discuss the situation with his aunt, who told him he did not have to sign any papers if he did not want to. At no time did Mark B. tell Kathy O. that he did not want to give their child up for adoption, but he testified that he did not think it was right. However, he felt that her parents gave them no option, and he made no effort to seek advice or help from any other source. He went to Peoria with the step-father of Kathy O., and met Lynn Ebker for the first time at the time the surrenders were signed. The documents were read out loud and explained to him and to Kathy O. Neither one had any questions, and both signed. At trial, both testified that they understood what they were signing, and both said that they knew they did not have to sign. Mark B. stated that he knew he could either keep the child or release it for adoption, that after he signed he could not change his mind, and that he knew he was giving up his rights to the child. He said his mother and step-father told him they would stand behind him and help him financially if he needed help, but he also said he felt pressured by the step-father of Kathy O. and that he thought he had no choice. According to Lynn Ebker, Mark B. signed first.

When Kathy O. returned home, her next-door-neighbor told her that the parents of Kathy O. had told the neighbor that they would have helped her if she had decided to keep the baby and that she could have lived with her grandmother. The neighbor had given up a child for adoption when she was 16 years old, and she said she would babysit while Kathy O. went to school. After being home two weeks, Kathy O. contacted Lynn Ebker, and upon being told that there was no way she could get the baby back, this suit was instituted. At the time of trial, both parents were 16 years old, unmarried, juniors in high school, and Mark B. was employed with two part-time jobs.

Upon appeal, the parents argue that the form of surrenders did not substantially comply with the Adoption Act, that Lynn Ebker obtained their signatures by fraud and duress, that their surrenders were not given

freely and voluntarily, and that the statute violates the constitutional rights of minors. We affirm the judgment of the trial court.

The first issue presented is whether the forms for consent to adoption used by the defendant Counseling and Family Services were in compliance with the statute prescribing the form of consent. Section 10 of the Adoption Act (Ill. Rev. Stat. 1981, ch. 40, par. 1512) prescribes the forms for consents and surrenders for adoption.

Section 10(C) begins:

> "The form of surrender to any agency given by a parent of a born child who is to be subsequently placed for adoption shall be substantially as follows and shall contain such other facts and statements as the particular agency shall require."

The title is to be: "FINAL AND IRREVOCABLE SURRENDER FOR PURPOSES OF ADOPTION."

The following paragraphs from the statute were not included in the document executed by Kathy O. and Mark B.:

> "That I do hereby surrender and entrust the entire custody and control of such child to the . . . (the 'Agency'), a (public) (licensed) child welfare agency with its principal office in the City of . . . . . . . . . . . , County of . . . . . . . . . . and State of . . . . . . . . . . for the purpose of enabling it to care for and supervise the care of such child, to place such child for adoption and to consent to the legal adoption of such child.

> That I hereby grant to said Agency full power and authority to place such child with any person or persons it may in its sole discretion select to become the adopting parent or parents and to consent to the legal adoption of such child by such person or persons; and to take any and all measures which, in the judgment of said Agency, may be for the best interests of such child, including authorizing medical, surgical and dental care and treatment, including inoculation and anaesthesia for such child.

> That I wish to and understand that by signing this surrender I do irrevocably and permanently give up all custody and other parental rights I have to such child.

> That I understand I cannot under any circumstances, after signing this surrender, change my mind and revoke or cancel this surrender or obtain or recover custody or any other rights over such child.

> That I have read and understand the above and I am signing it as my free and voluntary act." Ill. Rev. Stat. 1981, ch. 40, par. 1512(C).

Instead of the statutory language, the document signed by Kathy O. and Mark B. was titled: "SURRENDER OF CHILD AND CONSENT TO THE ADOPTION THEREOF AND ENTRY OF APPEARANCE."

In addition to name and address and age of the parents, the form contained the following declarations:

"That I do hereby consent and agree to the adoption of said child.
* * *

That I do hereby surrender the custody, control and all other parental rights that I may have in said child to HENRY SUOZZI as Executive Director of Counseling and Family Service of Peoria, Illinois, Inc., or his successor in office; and irrevocably agree that he may cause proceedings for adoption of said child to be commenced in any Court having jurisdiction and that he be, and is hereby, expressly authorized to consent to such adoption without any notice whatsoever to me.

That I do also enter my appearance in any proceeding pertaining to said child brought pursuant to the Adoption Act of the State of Illinois and/or Juvenile Court Act of the State of Illinois, and do hereby waive service of summons and submit to the jurisdiction of the Court before which said proceeding is filed or pending and consent to all orders and decrees entered by such Court in any of said proceedings."

In addition to the form of the consent, section 10 also requires that a consent be acknowledged by a parent before the presiding judge of the court in which the petition for adoption has been or will be filed or before, *inter alia*, a representative of a licensed child welfare agency (section 10(H)). Subsection (I) states:

"A surrender, or any other document equivalent to a surrender, by which a child is surrendered to any agency shall be acknowledged by the person signing such surrender, or other document, before a judge or the clerk of any court of record, either in this State or any other State of the United States, or before a representative of an agency or before any other person designated or approved by the presiding judge of the court in which the petition for adoption has been, or is to be, filed." Ill. Rev. Stat. 1981, 40, par. 1512(I).

Finally the form of acknowledgment is set out in full in section 10J. In the case at bar, the acknowledgment was in the precise form prescribed by statute, *i.e.*, the representative of a licensed agency certified that the parents acknowledged to her that they signed the consent and surrender as his and her free and voluntary act and that she "fully explained that by signing such instrument he [and she] were irrevocably relinquishing all parental rights." The certificate of the agency representative was acknowledged before a notary public. These formalities were held to be mandatory in *In re Adoption of Lucas* (1980), 87 Ill. App. 3d 1100, 409 N.E.2d 521.

■■ In determining whether the requirements of the statute were met, it

has been held that only substantial compliance with the statute is required. (*McConnell v. McConnell* (1931), 345 Ill. 70, 177 N.E. 692.) Thus exact conformity with the statutory language is not mandatory for the form of the consent if the irrevocable nature of the consent to adoption was made sufficiently clear and if the parents understood the consequences of their acts. *Hale v. Hale* (1978), 57 Ill. App. 3d 730, 373 N.E.2d 431.

■■ The consent signed by Kathy O. and Mark B. quite clearly indicated that the consents were irrevocable and that all parental rights were being given up permanently. Furthermore, both Kathy O. and Mark B. testified that the document was explained to them, that they understood what the consent meant, and that they knew they could not later change their minds. The evidence is clear and convincing that these parents knew the legal effect and consequences of the consent documents and that they were fully advised that they were permanently surrendering their parental rights to their child. Thus the purpose of the statute was met, even though the form was somewhat deficient. We believe the trial judge, Richard Eagleton, correctly advised the agency that use of the statutory form would have avoided this litigation.

■■ We think effect should be given to subsection 10(I), which refers to the acknowledgment of a "surrender, or any other document equivalent to a surrender * * *." (Ill. Rev. Stat. 1981, ch. 40, par 1512(I).) The legislature obviously intended that some document other than this statutory form could accomplish the purpose of surrendering a child to an agency for adoption. Considering the totality of the circumstances in this case, we conclude the consents were in substantial compliance with the statute.

■■ Next the parents argue that the trial court erred when it failed to find that the agency representative Lynn Ebker obtained their signatures through fraud and duress. They say that they were overwhelmed by their youth, their ignorance, and their circumstances, that they did not really want to give up their child but that they were inadequately advised and counselled as to possible alternatives. They insist that Lynn Ebker had a duty to press upon Kathy O. information as to public aid and other assistance available to her even when Kathy O. said she did not want to keep her baby and did not want such information. They further argue that Lynn Ebker should somehow have sought out the father and informed him of all his rights, although he was not her client and did not ask advice from her or any other source, even his own parents. These arguments presented on behalf of the parents are patently at odds with the law of Illinois, and most particularly the public policy which attempts to achieve the stability of adoption and the welfare of the adopted children.

In *People ex rel. Drury v. Catholic Home Bureau* (1966), 34 Ill. 2d 84,

213 N.E.2d 507, the Supreme Court of Illinois defined duress as an unlawful act of one which induces another to make a contract under circumstances which deprive him of the exercise of his free will, and also stated:

> "Mere annoyance or vexation will not constitute duress, but there must be such compulsion affecting the mind as shows that the execution of the contract or other instrument is not the voluntary act of the maker. [Citations.]

> Mere advice, argument or persuasion does not constitute duress or undue influence if the individual acts freely when he executed the questioned documents though the same would not have been executed except for the advice, argument or persuasion." 34 Ill. 2d 84, 92-93, 213 N.E.2d 507, 511.

These statements were quoted with approval in *Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 433, 369 N.E.2d 858, 864, where the court also accepted the definition of fraud set forth in *People ex rel. Chicago Bar Association v. Gilmore* (1931), 345 Ill. 28, 46, 177 N.E. 710, 717:

> "Fraud includes anything calculated to deceive, where it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture."

The court went on to observe that the concept of fraud involves " 'a wrongful intent—an act calculated to deceive.' " *Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 435, 369 N.E.2d 858, 865.

*Regenold* involved a natural mother who had given up her baby at least in part because she thought it needed medical treatment that she could not afford. She sought to have her surrender set aside on the ground that it was not her free and voluntary act but rather was executed as a result of fraud and duress. The court considered the very argument that the parents make here, that the totality of the circumstances of her personal life placed her under so much stress that she did not sign the surrender document freely and voluntarily, and that the adoption agency participated in the fraud and duress by failing to inform her of the various alternatives available to her, thereby depriving her of an opportunity to make a rational decision. The supreme court concluded that such conduct by the agency did not constitute fraud or duress. The court approved the legislative purpose of attempting to achieve stability of adoption and the welfare of adopted children, and, while recognizing the stress experienced by a mother in hopeless circumstances, concluded that the surrender should not be set aside in the absence of clear and convincing evidence of fraud and duress as defined by the courts.

Another factor to be considered is that, in order to set aside a consent,

the fraud and duress must have been accomplished by the person before whom the consent or surrender is acknowledged. (Ill. Rev. Stat. 1981, ch. 40, par. 1513.) Both Kathy O. and Mark B. testified that they felt pressure to sign from the parents of Kathy O. but not from Lynn Ebker. The fact that duress or fraud was practiced by some third party does not affect the validity of the consent in any event.

Neither the courts nor the legislature require that unmarried minor parents receive any counseling prior to executing a valid consent to adoption. The law requires only that the consent be executed knowingly and as a free and voluntary act before a person authorized to obtain a consent. Clearly Kathy O. received the necessary admonitions and explanations to meet the requirements of the law, and Kathy O. received much more in the form of counseling and advice. Social theories advocating that the State ought to provide more help should be addressed to the legislature, not to the courts.

■■ The parents' arguments overlook the fact that Kathy O. stated to the agency from the beginning that she wanted to give her baby up for adoption. She persisted in that intention throughout her pregnancy, and she carried through by executing a consent to adoption. We find no fraud or duress in the circumstances presented by the record in this case. Though both Kathy O. and Mark B. may have felt overwhelmed, those feelings are to be expected by such an event when 15-year-olds are confronted with the adult responsibilities of caring and providing for an infant. The standard on review is whether the trial court's finding that there was no fraud or duress was contrary to the manifest weight of the evidence. As our discussion of the evidence indicates, we find that there was substantial evidence to support the decision of the trial court.

The parents also argue that Lynn Ebker failed to provide them with sufficient understanding of their acts so that their signatures were not actually given freely and voluntarily as required by the statute. As we indicated previously, Kathy O. received extensive counseling, was familiar with the Florence Crittendon program for single girls who chose to keep their babies, and was told by her parents that they would help her whatever she chose to do. Mark B. did not receive counseling, but he too was told by his mother, just before he went to Peoria to sign the consent, that she would help him whatever he decided to do. Both parents testified that they knew they did not have to sign and that they were so advised. There was substantial evidence to support the trial court's conclusion that their consents were freely and voluntarily given, and that finding was not contrary to the manifest weight of the evidence.

We think it worth noting that at no time has the father suggested that he would be willing or able to take custody of the baby. From the beginning, he told Kathy O. that he would go along with whatever she

wanted to do, and he did not seek guidance or advice. We believe it worth observing that if lack of education, immaturity, and inexperience, are sufficient to permit a court to set aside surrender forms as not freely and voluntarily given, then 14- and 15- and 16-year-old parents would never be able to sign valid consents.

■■ The parents also advance two constitutional issues. First, they contend that sections 10 and 11 of the Adoption Act (Ill. Rev. Stat. 1981, ch. 40, pars. 1512, 1513) deprive them of their constitutionally protected rights to procedural due process and substantive due process because the surrenders can be taken and acknowledged by a representative of an agency without a hearing in court as to whether the surrender was a free and voluntary act. In other words, they claim that the State should not allow an agency to determine that the surrender was freely and voluntarily executed by the parents of a child, particularly in view of the fact their parental rights are entitled to the same protection as other fundamental rights. As they develop their argument, the parents state that minors particularly should be guaranteed "neutral counseling and constructive advice as to alternatives to adoption." This would seem to be part of the same policy argument presented above.

In the *Regenold* case, the supreme court recognized that the right of a parent to custody of his or her child is encompassed within the protection of the fourteenth amendment so that legislative interference of that right must not be arbitrary or without reasonable relation to some purpose within the competency of the State to effect. (See *Meyer v. Nebraska* (1923), 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 625.) In determining the constitutionality of the statutory provisions restricting revocability of the consent, the court balanced the parents' right to custody against the State's primary concern for stability of adoption and the welfare of children. The court held the statute to be "an expression of sound public policy," a matter "peculiarly within the competence" of the legislature, and stated, that "the judiciary should not attempt to alter or abrogate that clearly expressed legislative determination." *Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 440, 369 N.E.2d 858, 868.

The parents also argue that they should be entitled to special counseling prior to the waiver of their rights solely because they were minors. They suggest that in the case of minors, the record should indicate their full awareness of the consequences of their action based on an informed decision. A similar argument was rejected in *In re Adoption of Hoffman* (1975), 61 Ill. 2d 569, 338 N.E.2d 862, where the natural parents contended that they were denied due process when they signed consents to adoption without advice of legal counsel. The court held:

> "While it may be desirable for the natural parents of a child to have legal counsel prior to consenting to the adoption of the child, we

do not find it to be constitutionally required, particularly in view of the safeguards contained in * * * the Adoption Act, which specifies the form of the consent [citation] * * * which requires all consents of this type to be acknowledged by a parent before a judge or other person designated or approved by the court." (61 Ill. 2d 569, 579-80, 338 N.E.2d 862, 868.)

We believe the same holding applies to the argument advanced here. We conclude that the statute does not violate the due process rights of minor parents, but is reasonably related to the public policy purposes sought to be protected by the legislature.

■■ Finally, the parents argue that as minors, they are denied equal protection of the law because of the provision in section 11 which states: "The consent or surrender of a parent who is a minor shall not be voidable because of such minority." (Ill. Rev. Stat. 1981, ch. 90, par. 1513.) They argue that other contracts entered into by minors are voidable because of minority, and thus minor parents who surrender a child are denied the protection afforded minors who sign a contract to buy a car, for example.

To that argument we say once again, the legislature has balanced the need for finality and stability of adoption against the need to protect minors solely on the basis of their age. A surrender of adoption, unlike a contract to purchase a car, involves a third person—the child of the minor parents—who must also be protected by the public policy of the State. Because the legislature has determined that interest of the child requires the irrevocability of surrenders by parents, whether minors or adults, the statute denied minor parents the right to renounce a consent or surrender solely on the basis of age. A similar limitation is recognized at common law upon contracts by minors for necessaries furnished them. (*In re Estate of Johnstone* (1965), 64 Ill. App. 2d 447, 212 N.E.2d 143.) We conclude that the equal protection argument is without merit.

We affirm the judgment of the circuit court of Peoria County.

Affirmed.

ALLOY and HEIPLE, JJ., concur.