ROSENDO MEZA, JR., Plaintiff-Appellant, v. LISA RODRIGUEZ *et al.*, Defendants-Appellees.

Second District    No. 2—98—1140

Opinion filed June 25, 1999.

Jacqueline J. Montville, of De Kalb, for appellant.

Lawrence Schlam, of De Kalb, and James R. Buck, of Klein, Stoddard, Buck & Waller, of Sycamore, for appellees.

Kathryn Bischoff, of Rockford, for adoptive parents.

JUSTICE GEIGER delivered the opinion of the court:

The plaintiff, Rosendo Meza, Jr., appeals from the July 27, 1998, order of the circuit court of Winnebago County denying his motion to reconsider the dismissal of his complaint to establish his parental relationship to S.R., a minor child. The trial court dismissed Meza's complaint after finding that he had executed a final and irrevocable surrender of parental rights that was in substantial compliance with the requirements of the Adoption Act (the Act) (750 ILCS 50/0.01 *et seq.* (West 1996)). On appeal, Meza argues that (1) the certificate of acknowledgment of the surrender document did not conform to the requirements of the Act; (2) his execution of the surrender document

was procured by fraud and duress; (3) the surrender document is void because it was the result of the unauthorized practice of law; (4) the provisions of the Act are unconstitutional; and (5) the trial court erred in finding that he lacked standing to bring a paternity action. We affirm.

The instant litigation involves three separate cases that were consolidated below. The first case was a "Notice to Putative Father" proceeding that was filed on May 30, 1997. On June 5, 1997, Meza was notified that Lisa Rodriguez had identified him as S.R.'s father and advised him that Rodriguez intended to place S.R. for adoption. The notice advised Meza that, if he wanted to preserve his parental rights to S.R., he was required to file a declaration of paternity within 30 days. On October 9, 1997, Meza executed a written surrender of parental rights. Despite executing this surrender document, on October 23, 1997, Meza filed an entry of appearance with the trial court and a declaration of paternity.

The second case in this consolidated proceeding was a petition for the adoption of S.R., which was filed on October 15, 1997. The child welfare agency facilitating the adoption was defendant Children's Home and Aid Society of Illinois (CHASI).

The third case in the litigation was a petition to "Establish the Father and Child Relationship" filed by Meza on October 24, 1997. The petition named Rodriguez and CHASI as defendants. On October 30, 1997, as part of this case, Meza filed a motion to "Void or Revoke Consent to Adopt and Declaration of Paternity." In his motion, Meza sought to void his written surrender of parental rights.

On November 12, 1997, CHASI moved to dismiss Meza's complaint. CHASI alleged that Meza's parental rights were terminated on October 9, 1997, when he executed a final and irrevocable surrender for purposes of adoption.

On April 3, 1998, the trial court held an evidentiary hearing on CHASI's motion to dismiss. At the hearing, CHASI introduced a document entitled "Final and Irrevocable Surrender for Purposes of Adoption" which was executed by Meza on October 9, 1997. In addition to his signing the document, Meza initialed each of the typewritten paragraphs on the form. Meza's execution of the surrender was witnessed by Therese Sullivan, who was a pregnancy counselor for CHASI, and Deborah Michalowski, who was a nurse working at the De Kalb County Health Department, where the surrender was executed.

In addition to the surrender, Meza completed a parental affidavit form indicating that he had read the surrender document; that he understood the document; that he signed the document of his own

free will; that he understood that his decision was final and that he would never regain the right to his child; that no one had threatened him or made promises to him to induce him to execute the surrender document; and that all of his questions regarding the surrender had been answered to his satisfaction. This parental affidavit was also introduced into evidence.

Meza also completed a personal information form and a medical history form on October 9, 1997. Sullivan observed Meza fill out these forms and testified that it took Meza approximately 30 minutes to complete them. On the back of one of these forms, Meza wrote a message to S.R.'s adoptive parents. The message was as follows:

"Please inform me if your daughter is in a life and death situation.

P.S. I know she would love helicopter's [sic] especially in the med[ical]-field ***!!

I know my daughter is in good hands[.] Congratulations Father and Mother."

Following this message, Meza wrote his address and telephone number. These forms were also introduced into evidence.

CHASI also presented the testimony of Therese Sullivan. Sullivan testified that she spoke with Meza for the first time by phone on May 24, 1997. At this time, Sullivan told Meza that she had been working with Rodriguez, who was considering placing S.R. for adoption. Sullivan also told Meza that he would be receiving a "Notice to Putative Father" form and that he needed to respond to it. S.R. was born on September 28, 1997, and Rodriguez signed a surrender on October 2, 1997. On October 7, 1997, Sullivan contacted Meza to make arrangements for him to sign a surrender. Meza agreed to meet Sullivan on October 9, 1997, at the De Kalb County Health Department.

Sullivan testified that, when Meza arrived on October 9, 1997, she explained to him that none of his parental rights had yet been terminated. Sullivan explained that his execution of the surrender document would be a final act and asked Meza if he needed some additional time to make the decision. Meza told Sullivan that he was ready to sign the surrender and that he did not need any more time.

Sullivan testified that the mood in the room was serious at the time Meza executed the documents. Sullivan asked Meza whether he wanted Rodriguez to wait outside while he signed the surrender, but Meza did not request Rodriguez to leave the room. As Meza left after he executed the forms, he did not appear upset. Later that day, Sullivan signed the certificate of acknowledgment on the surrender form and had her own signature notarized.

Deborah Michalowski, a nurse at the De Kalb County Health

Department, also testified on CHASI's behalf. Michalowski witnessed Meza's execution of the surrender. Michalowski's testimony was consistent with that of Sullivan.

Warren Hienke, CHASI's regional director, testified that CHASI was a licensed child and family welfare agency. Hienke testified that Sullivan was an employee of CHASI and was authorized to take surrenders of parental rights.

Meza also testified during the hearing. Meza testified that he wanted S.R. and that he had told Rodriguez during the pregnancy that the baby could come live with his family. Meza bought clothes for S.R. and took them to the nursing home where Rodriguez worked. Meza repeatedly told Rodriguez that he wanted S.R. and that he would take care of S.R. if she did not want her.

When Meza went to the scheduled meeting with Sullivan on October 9, 1997, he believed that he was going to see S.R. However, when he arrived at the meeting, he was told that S.R. was already with her adoptive parents. At this time, Sullivan told him that Rodriguez had already executed the surrender documents. Sullivan also allegedly told him that S.R. had already been adopted and that he had lost his parental rights as a result of his failure to respond to the "Notice to Putative Father." Sullivan told him that he "might as well" sign the surrender because it would make it look like he was interested in S.R. and that he had not ignored his parental duties.

Although Meza acknowledged executing the surrender, he testified that he did not understand that he was signing a "serious" legal document. Meza testified that, while Sullivan read the surrender to him, he was "spaced out." Meza testified that he did not read the surrender and that he only signed it so that he could go home.

Meza also testified that the atmosphere in the room where he executed the surrender documents was disruptive. Rodriguez was present in the room and was giggling. Meza testified that he was angry with Rodriguez for giving up the child and that they began to quarrel. Also, while Meza was filling out the forms, a nurse came into the room to use a copy machine.

Drew Anderson, a mental health therapist, testified on Meza's behalf. Anderson testified that he first met with Meza on December 8, 1997. Anderson opined that Meza had been very uncomfortable during the execution of the surrender documents and that he had been under a lot of pressure. It was Anderson's opinion that Meza did not have the opportunity to process the momentous decision he was making. This opinion was based upon Meza's statements to him that (1) he was confused during the meeting; (2) Sullivan had told him that he had no parental rights and that signing the surrender was his only op-

tion; (3) he did not feel comfortable asking Sullivan questions; and (4) Rodriguez was present. Anderson believed that Meza executed the surrender documents under duress.

In his closing arguments, Meza argued that (1) the language contained in the certificate of acknowledgment of the surrender document did not comply with the statutory requirements of the Act; (2) his execution of the surrender document was procured by fraud and duress; (3) the surrender document was void because it was the result of the unauthorized practice of law; and (4) he should be permitted to bring a paternity action even if he had executed surrender documents.

On May 22, 1998, the trial court dismissed Meza's paternity action. The trial court found that (1) the surrender document was in substantial compliance with the requirements of the Act and was therefore valid; (2) Meza's execution of the surrender document was not procured through fraud or duress; (3) Sullivan did not engage in the unauthorized practice of law; and (4) Meza's execution of the surrender document deprived him of standing to pursue a paternity action.

In a motion to reconsider, Meza argued that the Act was unconstitutional because it improperly invaded the judiciary's power to protect and preserve parental rights. The trial court denied this motion and held that the Act was constitutional. Specifically, the trial court noted that the judiciary retained the authority to determine the validity of the surrender. Following the denial of his motion to reconsider, Meza filed a timely notice of appeal.

■ As his first argument on appeal, Meza argues that the certificate of acknowledgment form attached to his written surrender did not comply with the statutory provisions of the Act. As Meza correctly notes, a parent's surrender of a child for purposes of adoption is irrevocable only upon the execution of a consent or surrender document by the parent and an acknowledgment thereof executed by a representative of the child welfare agency. 750 ILCS 50/11(a) (West 1996). Section 10(C) of the Act provides specific language to be contained in the form of surrender to be executed by the natural parent. 750 ILCS 50/10(C) (West 1996). Additionally, section 10(J) of the Act provides specific language to be contained in the certificate of acknowledgment to the surrender that is to be executed by the representative of the child welfare agency. 750 ILCS 50/10(J) (West 1996).

In the instant case, there is no dispute that the surrender document executed and initialed by Meza conformed to the precise statutory language contained in section 10(C). However, the certificate of acknowledgment executed by Sullivan deviates in two ways from the statutory language contained in section 10(J). First, the certificate of

acknowledgment uses the word "consent" throughout the document, rather than the word "surrender." Also, the second paragraph of the certificate of acknowledgment deviated from the statutory language contained in section 10(J). Specifically, the certificate executed by Sullivan provided, "I have fully explained the foregoing consent." However, section 10(J) specifies the following form language:

> "I have fully explained that by signing such surrender he is irrevocably relinquishing all parental rights to such child or adult and he has stated that such is his intention and desire." 750 ILCS 50/10(J) (West 1996).

Meza argues that such deviations from the statutory language contained in the Act render his surrender void.

Compliance with the formalities of acknowledgment is necessary to the validity of the consent or surrender. *In re Adoption of Lucas*, 87 Ill. App. 3d 1100, 1103 (1980). The purpose of such formalities is to emphasize the solemnity of the step being taken and to provide protection for the parties to an adoption. *Lucas*, 87 Ill. App. 3d at 1103. However, it is important to note that sections 10(C) and 10(J) do not mandate use of the precise language contained in those sections. Rather, those sections provide that the form of surrender and the certificate of acknowledgment be "substantially" similar to the form language contained therein. 750 ILCS 50/10(C), (J) (West 1996). Additionally, sections 20 and 20a direct that the Act's provisions be liberally construed in a manner such that the best interests and welfare of the person to be adopted are accorded paramount consideration. 750 ILCS 50/20, 20a (West 1996).

On the basis of these principles, numerous courts have held that exact conformity with the statutory language for the form of consent or surrender is not required if the irrevocable nature of such an act was made sufficiently clear and if the parents understood the consequences of their actions. *Kathy O. v. Counseling & Family Services*, 107 Ill. App. 3d 920, 925 (1982); see *Hale v. Hale*, 57 Ill. App. 3d 730, 742 (1978). For example, in *Kathy O.*, the title and language of the consent form executed by the parents were different from the language contained in section 10(C) of the Act. *Kathy O.*, 107 Ill. App. 3d at 923-24. However, the language contained in the forms clearly indicated that the natural parents were surrendering their parental rights and giving their irrevocable permission for the adoption to proceed. Additionally, both parents testified that the document was explained to them and that they understood the legal effect and consequences of executing the document. *Kathy O.*, 107 Ill. App. 3d at 925. The reviewing court upheld the validity of the consents, noting that the purpose of the statute had been satisfied, even though the form was somewhat deficient. *Kathy O.*, 107 Ill. App. 3d at 925.

Meza asserts that we should adhere to the rule established in *In re Jennings*, 32 Ill. App. 3d 857, 861-62 (1975), *aff'd on other grounds*, 68 Ill. 2d 125 (1977), wherein the court required that the form of acknowledgment strictly conform to the statutory language contained in section 10(J). In *Jennings*, the certificate of acknowledgment lacked the statutory language that the parent had been told that "by signing such consent she [was] irrevocably relinquishing all parental rights to [the] child or adult and that she [had] stated that such is her intention and desire." *In re Jennings*, 68 Ill. 2d 125, 133 (1977). As noted above, similar statutory language was lacking from the certification of acknowledgment in the instant case. The court in *Jennings* held that the lack of this language invalidated the consent document executed by the parent. *Jennings*, 32 Ill. App. 3d at 861-62. Our supreme court subsequently affirmed this ruling on other grounds. *Jennings*, 68 Ill. 2d at 134. In so holding, the supreme court expressly declined to consider the effect of the failure of the acknowledgment to conform to the statutory language. *Jennings*, 68 Ill. 2d at 134.

We decline to follow the strict approach used in *Jennings* and instead believe that the substantial compliance rule adopted in *Kathy O.* better accomplishes the goals expressed in the Act. Although we acknowledge that *Kathy O.* involved the form of consent, we nonetheless believe that the principles expressed therein are equally applicable to the certificate of acknowledgment. Section 10(J) does not mandate use of the precise statutory language provided but instead requires execution of a certificate that is "substantially" similar to the language contained in the Act. 750 ILCS 50/10(J) (West 1996). As already noted, other courts have interpreted the same language appearing in section 10(C) to only require substantial compliance. See *Kathy O.*, 107 Ill. App. 3d at 925.

Additionally, the clear purpose of the acknowledgment requirement is to ensure that the natural parent is advised of the legal significance of executing the consent or surrender. Provided that there is evidence that the natural parent has been advised of the irrevocable nature of the surrender and that the parent has expressed an intent and desire to permanently abandon his or her parental rights, then the statutory goals underlying the acknowledgment requirement have been satisfied. See *Kathy O.*, 107 Ill. App. 3d at 925. Therefore, in instances where there is clear and convincing evidence of a parent's knowing and affirmative consent to surrender his or her parental rights, we hold that substantial compliance with the acknowledgment requirement is sufficient.

By so holding, we do not intend to abandon the form of acknowledgment requirements contained in section 10(J). Indeed, substantial

use of the statutory language contained in section 10(J) is specifically required. 750 ILCS 50/10(J) (West 1996). Compliance with such a requirement is a relatively simple task for child welfare agencies and should be practiced in every adoption proceeding. However, we believe that, in instances where there is evidence that the statutory purpose of the acknowledgment requirement has been satisfied, technical deficiencies in the form of the certificate of acknowledgment should not defeat an otherwise validly executed consent or surrender. See *Kathy O.*, 107 Ill. App. 3d at 925.

■ Turning to the instant case, we believe that there is clear and convincing evidence that Sullivan explained to Meza that, by signing the surrender document, he was irrevocably relinquishing his parental rights to S.R. The certificate of acknowledgment signed by Sullivan specifically indicated that she had explained the document to Meza. Additionally, at the hearing, Sullivan specifically testified that she read each paragraph of the surrender document aloud to Meza, then paraphrased each paragraph, and then asked Meza if he understood each paragraph. Sullivan testified that Meza stated that he had understood each paragraph, and he initialed each one. Such testimony was corroborated by Michalowski, who was present during the meeting and witnessed Meza's execution of the surrender documents. The paragraphs that Meza initialed specifically advised him that, by signing the surrender, he would permanently and irrevocably give up all custody and parental rights to S.R. and that he would not be able to subsequently change his mind under any circumstance.

Additionally, there is also clear and convincing evidence that Meza affirmatively expressed his intent and desire to execute such a surrender. The certificate of acknowledgment signed by Sullivan specifically indicated that Meza acknowledged that his execution of the surrender document was a free and voluntary act and for "the specified purpose." In addition, Meza executed a parental affidavit in which he indicated that he had read the surrender form, understood what it said, and signed the surrender of his own free will. Finally, we believe Meza's own personal written note to the adoptive parents congratulating them and advising them that his daughter would be "in good hands" demonstrates his understanding that his act of surrender was irrevocable and was taken voluntarily.

In light of such evidence, we believe that the statutory purpose of the acknowledgment requirement has been satisfied in the instant case. Although the form of acknowledgment lacks language indicating that Sullivan had advised Meza that he was relinquishing his parental rights and that Meza indicated his desire to do so, there is clear and convincing evidence that such acts did in fact take place during the

October 9, 1998, meeting. Thus the purpose of the statute was met, even though the form was somewhat deficient. Considering the totality of the circumstances, we conclude that the certificate of acknowledgment was in substantial compliance with the statute and that the surrender executed by Meza was therefore valid. See *Kathy O.,* 107 Ill. App. 3d at 925.

Meza's second argument on appeal is that the surrender document is not valid because it was the result of fraud and duress. Meza argues that he believed that the purpose of the October 9, 1998, meeting was so that he could see S.R. Meza argues that he was confused when he was told that S.R. was already with her adoptive parents and that he was not given enough time to contemplate the implications of signing the surrender. He specifically relies upon the testimony of Anderson, who opined that Meza did not feel comfortable asking Sullivan questions and that he executed the surrender documents under duress.

■ Section 11(a) of the Act provides that the surrender of a child by a parent to an agency for the purpose of adoption is irrevocable unless it was obtained by fraud or duress. 750 ILCS 50/11(a) (West 1996). In order to set aside a surrender, the parent must prove by clear and convincing evidence that it was procured by fraud or duress. *Regenold v. The Baby Fold, Inc.,* 68 Ill. 2d 419, 432 (1977).

For purposes of the Act, our supreme court has defined "fraud" as follows:

" 'Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture.' " *Regenold,* 68 Ill. 2d at 435, quoting *People ex rel. Chicago Bar Ass'n v. Gilmore,* 345 Ill. 28, 46 (1931).

To constitute fraud, the misrepresentation must be of a material fact and must be relied upon by the parent in executing the consent or surrender document. See *Regenold,* 68 Ill. 2d at 435-36.

Our supreme court has defined "duress" as " 'a condition which exists where one is induced by the unlawful act of another to make a contract or perform or forego an act under circumstances which will deprive him of the exercise of his free will.' " *Regenold,* 68 Ill. 2d at 432-33, quoting *People ex rel. Drury v. Catholic Home Bureau,* 34 Ill. 2d 84, 92 (1966). Mere annoyance or vexation will not constitute duress; rather, there must be " 'such compulsion affecting the mind as shows that the execution of the contract or other instrument is not the voluntary act of the maker.' " *Regenold,* 68 Ill. 2d at 433, quoting *Drury,* 34 Ill. 2d at 93. In order to set aside a consent or a surrender, the fraud or duress must have been accomplished by the person before

whom the consent or surrender is acknowledged. 750 ILCS 50/11(a) (West 1996). Meza was therefore obligated to demonstrate that Sullivan obtained his surrender through the use of fraud or duress.

■ After a careful review of the record, we do not believe that Meza has shown by clear and convincing evidence that his consent was procured by fraud or duress. Although Meza adduced much evidence at the hearing concerning his preparations for the birth of S.R. and his desire to keep the child, such evidence was simply not relevant to the issue of Sullivan's conduct in procuring the surrender. Additionally, we believe Meza's testimony that Rodriguez misrepresented her intentions regarding the adoption was similarly irrelevant to the question of Sullivan's conduct.

In support of his claim of duress, Meza points to his testimony that he felt uncomfortable during the October 9, 1997, meeting. Meza believed that he was going to visit with S.R. during the meeting and became confused when he was told that S.R. was already with her adoptive parents. Meza testified that there was "a lot of tension" in the room and that he executed the surrender so that he could "get out of that place." Meza testified that Rodriguez was "giggling" and that another employee from the De Kalb County Health Department came into the room during the meeting to make a photocopy.

However, under the applicable law, such activities do not rise to the level of unlawful acts necessary to show duress. See *Regenold*, 68 Ill. 2d at 433. Duress is not determined from a consideration of the subjective perspective of the parent but is determined from the conduct of the individual taking the surrender. See *Regenold*, 68 Ill. 2d at 435-36. We note that none of the conduct described above is directly attributed to Sullivan. Lacking any evidence of any unlawful act taken by Sullivan, there is simply no basis for finding that Meza's surrender was procured by duress.

Nor do we believe that Meza provided clear and convincing evidence of fraud. At the hearing, Meza testified that Sullivan told him that his parental rights had already been terminated. Certainly, if true, such a misrepresentation might constitute fraud. However, this testimony was specifically contradicted by Sullivan, who testified that she told Meza that his parental rights had not been terminated. Additionally, as noted above, Sullivan testified that she carefully explained the entire surrender document to Meza and asked him if he wanted some additional time to think about the decision. Sullivan's testimony was corroborated at the hearing by Michalowski. The trial court was in a superior position to determine the credibility of the witnesses. *Braun-Skiba, Ltd. v. La Salle National Bank*, 279 Ill. App. 3d 912, 920 (1996). In light of such conflicting testimony, we do not believe

that the trial court erred in finding that Meza had failed to establish fraud by clear and convincing evidence.

In so holding, we note that the trial court was not required to accord Anderson's testimony much weight. As Meza's therapist, Anderson was not present at the meeting on October 9, 1998, and did not meet Meza until two months later. Anderson could therefore only testify as to Meza's subjective feelings during the meeting, as reported to him by Meza. Although Anderson believed that Meza was under stress and felt pressured to sign the surrender, Anderson did not identify any unlawful act that deprived Meza of the exercise of his free will. Indeed, Anderson was unaware that Meza had initialed each paragraph of the surrender or that he had written a personal note to the adoptive parents.

■ As his third argument on appeal, Meza contends that the surrender document is void because it was the result of the unauthorized practice of law. Specifically, Meza argues that the Act improperly permits a child welfare agency representative, who is not an attorney, to explain the content and the legal consequences of executing the surrender document. Additionally, Meza notes that in the instant case Sullivan initially advised him that none of his parental rights had yet been terminated. Meza argues that, as a nonlawyer, Sullivan was not qualified to make such a legal representation.

We do not believe that the surrender document was the result of the unauthorized practice of law. Section 10 of the Act specifically authorizes the agents of licensed welfare agencies to take surrenders for the purposes of adoption. See 750 ILCS 50/10 (West 1996). As such, the legislature has indicated that it is appropriate for nonlawyers to take such surrenders. Courts have previously upheld the legislature's delegation of this responsibility to child welfare agencies. See *Kathy O.*, 107 Ill. App. 3d at 928-29.

Moreover, we do not believe that the taking of a consent or surrender constitutes the practice of law. The agency representative is not required to draft the consent or surrender document because the forms of consent and surrender and the certificate of acknowledgment are provided by statute (750 ILCS 50/10 (West 1996)). Therefore, all the agency representative is required to do in order to complete the form is to place the appropriate names in the appropriate blanks. The only further statutory requirements of the agency representative are (1) to advise the parent that execution of the document will irrevocably relinquish the parent's rights to the child; and (2) to attest that the parent has expressed his intent and desire to voluntarily relinquish his parental rights. See 750 ILCS 50/10 (West 1996). We believe that such acts do not rise to the level of practicing law. See *People ex rel.*

*Chicago Bar Ass'n v. Barasch,* 406 Ill. 253, 256 (1950) ("practicing law" is practicing as an attorney according to the laws and customs of courts as well as the giving of advice or rendition of any sort of service that requires the use of legal knowledge or skill).

Nor do we believe that any of Sullivan's specific conduct in the instant case constituted the unauthorized practice of law. Sullivan simply read the surrender aloud to Meza and explained its meaning to him. As noted above, this is what Sullivan was required to do under the Act and does not constitute the practice of law. Although Sullivan additionally told Meza that he had not yet lost any of his parental rights to S.R., her representations were based upon her conversation with attorney Stephen Balsley immediately prior to the October 9, 1998, meeting. Sullivan testified that she had met with Balsley specifically in order to confirm the status of Meza's parental rights. Additionally, Sullivan's statement in this regard was a true and correct statement of the law. Under these circumstances, we do not believe that Sullivan's conduct constituted the unauthorized practice of law.

In so holding, we note that *Herman v. Prudence Mutual Casualty Co.*, 41 Ill. 2d 468 (1969), is distinguishable from the instant case. The *Herman* case involved an allegation that a representative of an insurance company told the plaintiff that he should not consult an attorney and fraudulently explained the consequences of signing a release. *Herman*, 41 Ill. 2d at 478-79. Our supreme court held that such allegations supported an action for the unauthorized practice of law. *Herman*, 41 Ill. 2d at 479-80. Such circumstances are unlike those present in the instant case, as Sullivan neither denied Meza the right to an attorney nor made a misrepresentation of law to him. Rather, Sullivan stated the applicable law correctly after consulting with an attorney.

■ Meza's fourth argument on appeal is a challenge to the constitutionality of the Act. Meza argues that, in adopting the Act, the legislature has impermissibly delegated the right to terminate parental rights to a representative of a child welfare agency. Meza contends that parental rights are essential and basic constitutional rights and that their termination rests solely in the hands of the judiciary. Meza contends that the legislature has violated separation-of-powers principles by delegating this judicial function to child welfare agencies.

Illinois courts have previously rejected similar challenges to the constitutionality of the Act. In *Kathy O.*, the court specifically held that constitutional guarantees do not prevent surrenders for adoption from being taken and acknowledged by child welfare agencies without a court hearing to determine whether the surrender was a free and voluntary act. *Kathy O.*, 107 Ill. App. 3d at 928-29. Moreover, our supreme court has expressly upheld the surrender provisions of the

Act, holding them to be "an expression of sound public policy." *Regenold*, 68 Ill. 2d at 440. In light of these authorities, we reject Meza's constitutional arguments.

In so holding, we note that the Act does not deprive the natural parent of an opportunity to have a court review the voluntariness of the surrender. Indeed, this is precisely what occurred in the instant case. After Meza filed his complaint, he received a full evidentiary hearing and a court determination as to the voluntariness and validity of his surrender. In rejecting Meza's constitutional argument, the trial court correctly noted that the ultimate decision to terminate parental rights still lies with the judiciary. The Act does not deprive the judiciary of the right to review the propriety of the surrender procedure. See *Regenold*, 68 Ill. 2d at 434-36; *Kathy O.*, 107 Ill. App. 3d at 929. We therefore believe that Meza's constitutional argument is without merit.

■ As his final contention on appeal, Meza argues that he had standing to bring a paternity action notwithstanding his surrender. Meza contends that he has the right to establish that he is the biological father of S.R. so that (1) S.R. may retain the right to inherit from him; and (2) he can retain financial responsibility for S.R. should the adoptive parents be unable to do so. The trial court dismissed Meza's paternity action, finding that the issue was moot in light of his execution of the surrender documents. We agree.

We are aware of no authority that permits a putative father to maintain a paternity action after that parent has freely and voluntarily executed an irrevocable surrender document terminating his parental rights to the child. Although we acknowledge that an adoption does not necessarily terminate inheritance rights or the natural parent's continuing financial obligation to support the child (*People ex rel. Bachleda v. Dean*, 48 Ill. 2d 16, 19 (1971)), the establishment of these remaining rights and obligations was not the legislature's intent in enacting the Illinois Parentage Act of 1984 (750 ILCS 45/1 *et seq.* (West 1996)). Rather, the purpose of the Parentage Act was to provide for the support of the child so that the child did not become a public charge. See *Happel v. Mecklenburger*, 101 Ill. App. 3d 107, 116 (1981).

While courts have permitted putative fathers to seek a declaration of paternity pursuant to the provisions of the Parentage Act or as part of a declaratory judgment action, the putative fathers in those cases brought the actions in order to establish all of their parental rights, including custody, visitation, and affirmative financial support. See *In re Petition of Sullivan*, 134 Ill. App. 3d 455, 457 (1985); *Pritz v. Chesnul*, 106 Ill. App. 3d 969, 970, 973-74 (1982). Here, Meza has already voluntarily abandoned these precise parental rights. We

therefore see no legitimate purpose in expending judicial resources for the sole purpose of establishing Meza's identity as S.R.'s natural father.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

THOMAS and GALASSO, JJ., concur.