## GEORGE McDONALD *v*. BREVET MAJOR JAMES H. CARLTON.

Duress of Imprisonment.—To constitute duress, an imprisonment must be tortious, and without lawful authority, or by an abuse of lawful authority.

Lawful Imprisonment no Duress.—Imprisonment under regular and lawful process, upon probable cause and without malice, does not constitute duress so as to invalidate a contract entered into by the prisoner to procure his freedom, unless he has been induced thereto by unlawful force or privations.

Re-enlistment by Soldier Lawfully Imprisoned.—A contract of re-enlistment voluntarily entered into by a soldier while under lawful arrest for a military offense, through the friendly counsel of his guards, but without any request or solicitation of the enlisting officer, though upon his promise that the charge pending will be dismissed if the soldier's future conduct is good, is not invalid for duress.

Enlistment on Sunday Valid.—There is no law in this territory invalidating a contract of enlistment by a soldier entered into on Sunday.

APPEAL from the third judicial district. The case appears from the opinion.

*J. S. Watts,* for the appellant.

*H. N. Smith,* for the appellee.

By Court, BENEDICT, J.:

This was a cause tried before Justice Benedict, judge of

the third judicial district, on the twenty-first day of July, 1856. McDonald, by Hon. John S. Watts, presented to the judge his sworn petition, stating, among other things, that he was illegally confined and restrained of his liberty at the guard-house in Albuquerque, by one Major James H. Carlton, commanding K company, First Dragoons, United States army, under the pretense that he was, on the eighteenth day of March, 1855, legally enlisted into the service of the United States as a soldier in said company, when in truth and in fact said enlistment was absolutely void, because it was made on Sunday. At the time of making said enlistment he was imprisoned and under duress, which also rendered void any engagements which may have been made by him, and confers no right upon the United States to restrain him of his liberty under such supposed enlistment. Upon this the judge immediately issued a writ of *habeas corpus* to said Carlton, who, on the next day, returned the writ, and produced McDonald in his proper person before the judge, and answered in substance that he detained him as an enlisted soldier in the army of the United States, and that his enlistment was made on the eighteenth day of March, 1855, and that he was restrained in the guard-house awaiting the sentence of a court-martial upon charges for which he had been tried. After hearing the cause, the judge pronounced his judgment: "That McDonald was rightfully and lawfully detained in the military service of the army of the United States, in company K, commanded by said Carlton, and said judge did order and adjudge that said McDonald be remanded to the said service, and to the custody of said Carlton, to be as before the issuing of the writ."

From this judgment McDonald appealed to this court, and assigns for error the act of the judge in rendering such judgment.

This involves an inquiry into the nature and effect of the testimony embodied in the bill of exceptions, to enable us to determine what judgment should have been rendered. The grave allegation contained in the peti is, that at the time of McDonald's enlistment as a sol██ the army

of the United States he was imprisoned and under duress. It appears by the testimony of William McClear, that he was first sergeant of company K, United States army, and that McDonald was a private in the same. On the twenty-seventh day of March, 1855, the latter would have completed one term of service. On the twelfth of that month, he had been put in the guard-house, and witness understood that charges of a serious nature had been preferred against him, such as, if true, might stop all the pay then due McDonald, and cause him to be drummed out of the service; that on the eighteenth day of the same month he re-enlisted; that the day before, he was let out of the guard-house, and went to the company quarters and washed and cleaned himself. Previous to enlisting, he asked the witness what he had better do. Appeared to be in trouble about his case, and the charges that had been preferred against him. Witness did give his opinion, but not until after McDonald had re-enlisted. He then stated to him, that in his opinion he had done the best he could for himself. Witness knew of no practices made use of by Major Carlton, or any other person, to harass McDonald into a re-enlistment, and he was subjected to no more rigorous treatment than other prisoners in the guard-house. McDonald is a Scotchman, and first enlisted in New York, and when not in liquor was a good soldier and a good man; that since he enlisted he has been tried on charges. Does not know of Carlton using any practices, by himself or through other persons, to harass or procure men to re-enlist against their consent. Never heard Carlton speak to McDonald upon the subject of his re-enlistment. This was substantially all that this witness testified, except that he was not positive upon what day of the week the enlistment took place, but thought it was Sunday, to the best of his recollection.

Lewis, a private in the same company, testified in substance that he thought McDonald was re-enlisted on Sunday, but, owing to the lapse of time, was not positive. Was guard over him a few days previous. The guard being fellow-sold▓▓▓of his, some of them, from feelings of friendship, adv▓▓▓▓im to re-enlist, and that it would be better

for him, as it was the general impression that if he did not re-enlist he would be tried and drummed out of the service. The charges for which he was in the guard-house were for being drunk on guard and found asleep on post as a sentinel. The conversation of the guard about McDonald's case was in his presence, but does not know if any of it was addressed to him; they were talking of what would be best for him to do, as from the nature of the charges they thought it must go hard with him. Does not recollect of his being told that he would lose his pay and be drummed out. McDonald knew what would be the consequences, from the nature of the charges, if tried. The fellow-soldiers were of the opinion that it would be best for him to re-enlist. Major Carlton seems to have been himself sworn, without objection, and in substance testified that, a day or two previous to re-enlisting, McDonald solicited him to re-enlist him and to have the charges preferred against him withdrawn, and he agreed to withdraw the charges upon McDonald promising to do better and behave himself well and not get drunk. Should he do so he might leave his final papers in witness' hands and secure his money. There was due him between two hundred and fifty and three hundred dollars on his final papers. That he had several conversations with McDonald, at his own request, about the charge against him and re-enlisting. That he used no force, no violence, to induce McDonald to re-enlist. When not drinking, is a good man and a good soldier. Had he not re-enlisted, he probably would have been prosecuted on the charges against him. They were preferred by Lieutenant Daniels, and if they had been proved true, would, perhaps, have cost McDonald his pay, and he would have been dishonorably discharged if found guilty. A court-martial would have sentenced him to great punishment. After he re-enlisted, witness withdrew the charges, and they were destroyed. Had he not re-enlisted after having been let out of the guard-house, he probably would have been returned to it again and tried on the charges. Witness, in good faith, carried out the agreement on his part, withdrew the charges, and re-enlisted McDonald, and

he received all the pay, bounty, etc., due him. He signed the papers and left his final papers with witness, December, 1855, and received all the bounties attending re-enlistments in this country. That it was a fair bargain, made in good faith, and no force or violence was used to induce McDonald to re-enlist. He did so because he thought it was best for him. Since he returned from the expedition to the Mescalera Apache country, after the death of Captain Stanton, McDonald has been most of the time in the guard-house on sundry offenses arising out of liquor. He has lately been tried on the following charges: 1. Desertion of his post when on guard; 2. Disobedience of orders. To the first he pleaded guilty, to the second not guilty. Is candid in admitting anything of which he is guilty. He is now confined in the guard-house awaiting sentence of a court-martial, which recently sat in his case. Witness has frequently endeavored to procure the remission of punishment inflicted on McDonald by courts-martial, and has many times succeeded. Witness had nothing but the good of this man in view in all the matter of re-enlistment. Lately sat upon a court-martial to try McDonald upon the charges for which he is now confined in the guard-house. Is under oath not to publish the sentence which the court found, that with all the proceedings of the court in the case, having been transmitted to General Garland for consideration, etc. McDonald is now kept in the guard-house awaiting the action and the publication of the sentence. Desertion is the only offense for which a soldier can be drummed out of service.

Mr. Clark testified that he was notary public and administered the oath to McDonald upon his re-enlistment. Does not know the day of the week upon which it was done, and can not say what day it was.

We have made an ample statement of the testimony given in this cause, that its bearing can be well understood when applied to the conclusion to which our minds have arrived. McDonald states that he was imprisoned and under duress when he enlisted. Duress in law books is defined to be an actual or threatened violence or restraint of a man's person, contrary to law, to compel him to enter into a contract or

discharge one: See 1 Bouv. Law Dict. 493. By duress
in its more extended sense is meant that degree of
severity, either threatened or impending or actually inflicted,
which is sufficient to overcome the mind of a person of
ordinary firmness: See 2 Greenl. on Ev. 302. If the
the contract is entered into by means of violence offered to
the will, or under the influence of undue restraint, the
party may avoid it by the plea of duress, and it is requisite
to the validity of every agreement that it be the result of a
free and *bona fide* exercise of the will. If a person be
under an arrest for improper purposes, without a just cause,
or where there is an arrest for a just cause, but without
lawful authority, he may be considered as under duress.
The general rule is, that either the imprisonment or duress
must be tortious and without lawful authority, or by an
abuse of the lawful authority to arrest, to constitute duress
by imprisonment: 2 Kent Com. 453. Assent must not
only be mutual, but it must be freely and voluntarily
given in order to create a valid contract: Story on Con.,
313. The general rule of law is, that imprisonment, under
regular and formal and legal process, does not constitute
such duress as will invalidate the contract of the prisoner.
If, therefore, a prisoner execute a deed or note, or make
any other agreement, in order to obtain his freedom, it will
be binding upon him if he be legally imprisoned, upon
probable cause and without malice, although the plaintiff
actually have no well-founded cause of action: See same,
314. If the imprisonment be lawful and the prisoner be
abused by force or by unnecessary and unlawful privations,
as of food, and be thereby induced to make a contract, it
may be avoided by him: See same, 316. A threat to do
a legal act or subject the party to the legal consequences of
a refusal to make an agreement, is not duress: See same,
318. If a man be lawfully imprisoned, and either to pro-
cure his discharge, or on any other fair account, seals a
bond or deed, this is not by duress of imprisonment, and
he is not at liberty to avoid it: See 2 Jac. Law Dict.
323. That species of compulsion which does not appear
in overt acts of violence or threats, but in over-persuasion

and advantage taken by parties in peculiar relations of trust or influence over the weak and ignorant, comes within the purview of constructive fraud: See Story on Con. 321.

· The mind has no severe task in applying the testimony in this cause to these plain and fixed principles of law and forming its decision correctly. At the time of McDonald's re-enlistment he was lawfully a private soldier of the United States army in company K, under command of Brevet Major Carlton, at Albuquerque, still having some days to serve to complete a previous enlistment of five years. Six days before, he had been committed as a prisoner to the guard-house. That he was lawfully imprisoned, we think from the evidence is incontrovertible. Lieutenant Daniels had charged him with drunkenness on guard and being found asleep on his post as sentinel. Nothing appears in the evidence leading to a conclusion that he was falsely accused, or that he was the victim of malice or mistake. The charges were of a very serious nature in a military point of view, destructive of confidence and discipline, if true, and perhaps endangering property placed under his watch and other interests belonging to the service, though in a peaceful village. Carlton had a full lawful right, as his commanding officer, to cause his imprisonment until a court-martial could sit and try him. The guard were fellow-soldiers of McDonald, and, as appears from private Lewis' testimony, were touched with honorable sympathy for the misfortunes of their comrade in arms. They talked about the matter in his presence. Both he and they seemed to be impressed that it would go hard with him should he be tried. They were solicitous for him to do the best for himself under the circumstances. No question was made as to the charges not being true. The soldiers thought it would be best for him to re-enlist. This they advised him to do. In all this we see no improper conduct towards McDonald. They but gave him their sincere opinions, as friend might advise friend. Sergeant McClear understood that McDonald was in the guard-house under serious charges, such as, if true, might stop his pay, etc. Previous to re-enlisting he seemed to be in trouble about his case, and asked the sergeant

what he had better do. The sergeant, evidently from a high spirit of delicacy, refused to give him his opinion until after he had enlisted. He then told him he had done the best he could do for himself. The day before he re-enlisted he was let out of the guard-house, and he went to the company quarters, according to Major Carlton, who testified, without objection being made. McDonald went to him and solicited the major to re-enlist him and to have the charges withdrawn. The conduct of the major upon this application should forever preclude complaints on the part of Mc-Donald against his commander. He seemed to have listened readily to the request of the soldier and prisoner, who was, as Sergeant McClear says, in trouble. The only conditions he asked were that McDonald should behave well and not get drunk. He promised to withdraw the charges and offered to receive and keep his final papers, so as to secure to him the money due him, which amounted to between two hundred and fifty and three hundred dollars. There is no evidence that he threatened McDonald with any of the consequences should he be tried and found guilty. The conversation was at his own request, and Carlton made use of no force or violence to induce a re-enlistment. Mc-Donald did re-enlist, and the charges were withdrawn and destroyed. Had he been tried upon them, as he lawfully might have been, and had he been found guilty, he would have been sentenced to a loss of the pay due him and to dishonorable discharge. Subsequently he received all of his pay and all bounties attending a re-enlistment in this country.

It is not for us to say that in this matter Major Carlton, owing his high military obligations to his government and to his superiors in command, went too far in his kindness and good will to McDonald, appealing to him in the midst of his troubles. There is, however, one thing that we will say—that we give full credit to Major Carlton's declarations in his testimony that he had nothing but Mc-Donald's good in view in all the matter of re-enlistment, and that he thought it was best for him to re-enlist. We will not refrain from saying that in that transaction we can not

regard Major Carlton as evincing towards McDonald any
other feelings or motives than those that do him honor as
a man. We deem it but justice to extend the sentiment
of this remark to Sergeant McClear and to the fellow-soldiers
who evinced their anxiety for McDonald's welfare. In all
this affair we do not find him under any unlawful imprison-
ment. There was nothing that the law can pronounce
duress over his will and power of free consent. This we think
the evidence compels us to assert. Instead of dishonorable
discharge, he has received from the government all the
bounties following a re-enlistment in this country, and all
the pay and clothing to which he was entitled at the expira-
tion of his first service. It would seem as if so exact and
just a fulfillment of its engagements on its part should have
continually admonished this petitioner of a quick sense of
good faith and obligation on his side, instead of cultivating
vain ·hopes that the civil judicial tribunals would absolve
him from his legal duties as a soldier, to the performance
of which he had solemnly bound himself. These tribunals,
deeply penetrated with the consciousness to what a large
extent the safe-keeping of good faith, justice, and order are
reposed in their hands and acts, will carefully deliberate so
as to guard within the halls of justice all contracts founded
in free consent, morality, and sound public policy, as not to
minister to a loose and unscrupulous spirit that refuses all
respect and compliance with correct principles when it
opposes itself to passions intent on mischief, to present
conveniences and interests. In this republic, to be a sol-
dier of her army should inspire him with a high and inflex-
ible spirit of honor and duty, and he should not permit,
even for a moment, the feeling to steal upon his mind that
there is demerit and degradation in his profession, and that ·
it is fair to present any class of pretenses and through them
seek to escape from an enlistment. If, from faithlessness,
McDonald fell under charges and incurred the dangers of
military penalties, in his own want of self-control and in
his intemperate habits he will easily find the cause.

His .commander bears unhesitating testimony to his
being a good man and good soldier when free from the

influence of liquor. To this officer he appealed for rescue from the consequences of his own alleged offenses, and it is not for us to say Carlton, owing as he did his high obligations to his government and superiors in command, went too far in his good will to this soldier in trouble. We think, however, it is but just to say that we give full credit to the major's declarations as a witness, that in the whole matter of enlistment he had nothing in view but McDonald's good, and that the latter was doing the best he could for himself. The evidence exhibits no other feelings or motives on the part of Carlton than those that do him honor as a man, and we extend the sentiment of this remark to sergeant McClear and the fellow-soldiers who evinced so commendable an anxiety for McDonald's welfare. It remains now to add, that nowhere in this affair do we find this man under any unlawful imprisonment. There was nothing that the law can pronounce duress over his will and power of free consent. This the evidence compels us to decide. It is in proof, that at the time of the issuance of the writ of *habeas corpus*, McDonald was in the guard-house awaiting the sentence of a court-martial, before which he had pleaded guilty to the charge of deserting his post when on guard. This, of itself, should have determined the cause against him, let the elements that entered into his re-enlistment have been as they may. It was over him in all its practical effects, and he was, in every point of view, a soldier in the actual service of the United States army, and subject to its laws and rules. Occupying that position, he was charged with a military offense, in a matter over which a court-martial had complete power. It took jurisdiction and tried and decided the cause, and it was not for the civil arm to stretch itself within the guard-house to snatch McDonald from under the sentence he was properly confined to receive. As to the averment of the petitioner, that his re-enlistment was made on Sunday, we have only to remark that we know of no law in this territory that would invalidate the contract for such a cause, and, furthermore, the proof is insufficient to establish the fact that it was consummated on that day of the week. It is the unanimous opinion of this court

that this cause was rightly determined by the judge in his district, and his judgment is hereby affirmed, with costs. Affirmed.

This cause came on to be heard upon the record and errors joined, and was submitted without argument, and the court being now fully advised in the premises, it is considered, ordered, and adjudged by the court, that the judgment by the judge below in this cause be and the same hereby is affirmed, with costs.