864 P.2d 803

**In the Matter of KIRA M., a child.**

**State of New Mexico ex rel. Human Services Department, Petitioner–Appellee,**

**and concerning Michelle B., Respondent–Appellant,**

**and**

**James M., Respondent.**

**No. 14446.**

Court of Appeals of New Mexico.

Sept. 8, 1993.

Certiorari Granted Nov. 23, 1993.

Tom Udall, Atty. Gen., Judith A. Ferrell, Sp. Asst. Atty. Gen., Santa Fe, for petitioner-appellee.

Richard J. Grodner, Albuquerque, for respondent-appellant Michelle B.

*OPINION*

APODACA, Judge.

Mother appeals the children's court's denial of her motion to revoke her relinquishment of parental rights and consent to adoption and the court's granting summary judgment to the Human Services Depart-

ment (HSD). The issue presented to us is whether a relinquishment of parental rights and consent to adoption can be withdrawn on the grounds that it was involuntary. Because we hold that Mother has alleged facts sufficient to raise an issue concerning the voluntariness of her consent, we reverse and remand for an evidentiary hearing on Mother's claim that her relinquishment of parental rights and consent to adoption was involuntary. In light of our disposition, we need not reach Mother's issue of whether NMSA 1978, Section 40–7–38(F) (Repl.Pamp.1989), violates Mother's constitutional rights to due process. *See Huey v. Lente,* 85 N.M. 597, 598, 514 P.2d 1093, 1094 (1973) (constitutional questions decided only if necessary to the disposition of the case).

**FACTS**

In August 1991, HSD filed a petition alleging that Kira, Mother's nine-year-old daughter, was a neglected and abused child. The petition requested custody of Kira and named Mother and James M., Kira's biological father, as respondents. On August 30, 1991, after a hearing, Mother stipulated to an order continuing custody of Kira with HSD, which placed Kira with a foster parent.

In November 1991, a social worker employed by HSD counseled Mother regarding her alternatives to relinquishing her parental rights to Kira. The record shows that the counseling included discussion of the meaning and consequences of voluntary relinquishment; alternatives to voluntary relinquishment; parental preferences for adoptive placement; and whether Mother was voluntarily deciding to relinquish her parental rights to Kira. Later, a hearing was held, at which the children's court asked Mother whether she was voluntarily relinquishing her parental rights. Mother stated that she was voluntarily relinquishing such rights, without coercion or threats. After a lengthy inquiry, the children's court found that Mother was signing the relinquishment voluntarily, knowingly, and intelligently. Mother signed the relinquishment in the presence of the court, which certified the document.

In May 1992, Mother filed a motion to revoke or withdraw her relinquishment of parental rights. She alleged that she signed the relinquishment "under threats from her husband [Stepfather], at the time, which overrode her own free will and desire." Stepfather allegedly threatened to prevent Mother from ever seeing her other child again if Mother did not relinquish her parental rights to Kira. Because of Stepfather's personality and previous hostile acts, Mother said she believed that he would carry out his threats if she didn't do what he demanded. At the time the motion was filed, no adoption petition had been filed.

HSD later filed a motion to dismiss Mother's motion or for summary judgment on the grounds that, under Section 40–7–38(F), the sole basis for withdrawing a relinquishment of parental rights was fraud and Mother did not allege fraud. HSD further asserted that, even if duress was a proper ground for setting aside a relinquishment, the duress alleged by Mother was insufficient to support withdrawal of her relinquishment. No evidence, other than Mother's affidavit alleging the threats, was presented or considered. The children's court granted HSD's motion and denied Mother's withdrawal motion on the grounds that there was "no genuine issue of material fact and this matter can be decided as a matter of law," and "[t]here is no sufficient basis to void the relinquishment."

**DISCUSSION**

This appeal involves the interplay of two subsections of NMSA 1978, Section 40–7–38 (Repl.Pamp.1989). On the one hand, Section 40–7–38(A)(4) requires a relinquishment of parental rights to state "that the person executing the consent or relinquishment has been counseled regarding alternatives to adoptive placement and with this knowledge is voluntarily and unequivocally consenting to the adoption of the named adoptee." Section 40–7–38(F), on the other hand, states:

A consent to or relinquishment for adoption shall not be withdrawn prior to the entry of a judgment of adoption unless the court finds, after notice and opportu-

nity to be heard is afforded to the petitioner, to the person seeking the withdrawal and to the agency placing a minor for adoption, that the consent or relinquishment was obtained by fraud. In no event shall a consent or relinquishment be withdrawn after the entry of a final decree of adoption.

The issue raised by Mother requires us to apply pertinent rules of statutory interpretation. In construing a statute, this Court's primary concern is to ascertain and give effect to the legislature's intent. *State ex rel. Klineline v. Blackhurst,* 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988). To achieve this, we read the legislation in its entirety and "construe each part in connection with every other part to produce a harmonious whole." *Id.* If possible, we give effect to each portion of the statute. *Methola v. County of Eddy,* 95 N.M. 329, 333, 622 P.2d 234, 238 (1980). Unless the legislature indicates otherwise, we give the words of the statute their ordinary meaning. *Klineline,* 106 N.M. at 735, 749 P.2d at 1114.

HSD contends that Section 40–7–38 is unambiguous and should be applied as written. *See Johnson v. Francke,* 105 N.M. 564, 566, 734 P.2d 804, 806 (Ct.App. 1987). HSD also argues that strictly interpreting the statute as allowing only one ground for revocation of a relinquishment of parental rights—fraud—would promote the intent of the legislature to promote the child's best interests and welfare while protecting the biological parents' rights. *See Barwin v. Reidy,* 62 N.M. 183, 307 P.2d 175 (1957); *In re Adoption of Bradfield,* 97 N.M. 611, 614, 642 P.2d 214, 217 (Ct. App.1982). HSD views Section 40–7–38 as establishing a two-step process. In the first stage, the biological parent's rights are protected by providing a procedure in which the biological parent is counseled regarding alternatives to adoptive placement, *see* § 40–7–38(A), and requiring that the consent be signed before and approved by a judge or individual appointed to take consents by an agency certified or licensed to place children for adoption. *See* NMSA 1978, § 40–7–39(A) (Repl.Pamp.1989). In

the second stage, HSD argues, the focus shifts from consideration of the biological parent's rights to the protection of the child's best interests, and at this stage the legislature has determined that, in the absence of fraud, it is in the child's best interests to proceed with adoption. *See In re Adoption of Doe,* 87 N.M. 253, 255, 531 P.2d 1226, 1228 (Ct.App.), *cert. denied,* 87 N.M. 239, 531 P.2d 1212 (1975).

However, because we discern no clear legislative intent to establish such a two-step process, when reading the statute as a whole, and also discern a possible inconsistency between Section 40–7–38(A)(4) and Section 40–7–38(F), we reject HSD's contention that the statute is unambiguous. Additionally, it is not clear from the language of Section 40–7–38(F) that the subsection necessarily applies to the facts of this appeal, where no adoption petition had been filed at the time Mother filed her withdrawal motion. The subsection's references to "the entry of a judgment of adoption," to "the petitioner," and to "the agency placing a minor for adoption" could be interpreted to mean that Section 40–7–38(F) may apply only when a petition for adoption of the child is actually pending. *Cf. In re TR,* 777 P.2d 1106, 1116–18 (Wyo. 1989) (Golden, J., dissenting) (concluding that irrevocability provision does not apply where no adoption petition has been or is likely to be filed). However, the parties do not raise this argument on appeal. We thus have assumed, without deciding, that Section 40–7–38(F) is applicable to the facts of this case. Although the fact that an adoption petition was not pending is important to our reasoning, we have followed a different path to our resolution of the issue.

HSD draws our attention to *Doe,* in which this Court interpreted NMSA 1953, Section 22–2–27(D) (Supp.1973), the predecessor to Section 40–7–38, as compelling the conclusion that a consent may be withdrawn only on the basis of fraud. In that case, after an adoption petition for the child was filed, the biological mother filed a motion to intervene in the adoption proceedings, attempting to withdraw her relin-

quishment of parental rights and consent to adoption. She contended that her consent was involuntary because it was signed within twenty-four hours of the child's birth while she was still in the hospital and emotionally upset. *Doe*, 87 N.M. at 254, 531 P.2d at 1227.

In response to her contention, this Court stated that:

> Since the adoption of children is solely a creature of statute, unknown to the common law, it is important to note that our legislature has seen fit to provide but a single ground for the revocation of consent, namely, fraud.... Our legislature has created a presumption that once there has been a consent by the natural parent, absent fraud, it is in the best interests of the child to proceed with the adoption.

*Id.* at 254–55, 531 P.2d at 1227–28 (citations omitted). *Doe* further concluded that the specific facts alleged by the biological mother ("(1) emotional upset, (2) hospitalization and (3) timeliness after birth") were insufficient as a matter of law to void the consent. *Id.* at 255, 531 P.2d at 1228. However, this Court also stated that, under the facts presented, it was "unnecessary to decide whether in all cases that do not allege fraud a claim is stated if the allegation is involuntariness of consent." *Id.* We thus conclude that *Doe* was limited to its facts. We also deem it important to note that Judge Hernandez, in his dissent to the majority's opinion, would have read Section 22–2–27(D) as if the word "valid" had been inserted before the word "consent." *Id.* (Hernandez, J., dissenting). Thus, under the dissent's analysis, a *valid* consent could be withdrawn only if fraud was alleged; however, a consent could be otherwise shown to be invalid on other grounds, including that it was involuntarily given. *See also* § 40–7–38(D) (no consent or relinquishment shall be valid if executed within forty-eight hours of adoptee's birth).

Although HSD concedes that *Doe* "seems to have left open the possibility that a plea of involuntariness might withstand a motion to dismiss," it argues that the additional procedural protections contained in the current statute have eliminated that possibility. We disagree. In *Barwin*, our Supreme Court apparently recognized the possibility that a parent might consent to an adoption as a result of improper duress or coercion, and that the consent might be ineffective as a result. Our Supreme Court stated:

> "Duress in law books is defined to be an actual or threatened violence or restraint of a man's person, contrary to law, to compel him to enter into a contract or discharge one.... By duress in its more extended sense is meant that degree of severity, either threatened or impending or actually inflicted, which is sufficient to overcome the mind of a person of ordinary firmness...."

*Id.* 62 N.M. at 197–98, 307 P.2d at 185 (quoting *McDonald v. Carlton*, 1 N.M. 172, 176–77 (1857)). *Barwin* also noted that " '[t]hat species of compulsion which does not appear in overt acts of violence or threats, but in overpersuasion and advantage taken by parties in peculiar relations of trust or influence over the weak and ignorant, comes within the purview of *constructive fraud*....' " *Barwin*, 62 N.M. at 198, 307 P.2d at 185 (emphasis added) (quoting *McDonald*, 1 N.M. at 177–78). Although our Supreme Court concluded that the duress alleged in *Barwin*—the poverty of the biological parents—was "duress of circumstances" that did not render the biological parents' consent to the adoption of their child ineffective, *id.*, we could conceivably determine in this appeal that this definition of "constructive fraud" was considered by the legislature when it drafted Section 40–7–38(F) and its predecessors. Instead, we prefer to base our holding on the grounds that equal effect must be given to all parts of Section 40–7–38 to fully effectuate the legislature's intent to ensure that a parent freely and voluntarily consents to his or her child's adoption.

■ We have no quarrel with HSD's argument that the public policy and objective concerning adoption is to promote the best interests of the child. *Nevelos v. Railston*, 65 N.M. 250, 254, 335 P.2d 573, 576 (1959). At the same time, however, the

parents' rights must also be protected. *In re Adoption of Doe*, 101 N.M. 34, 37, 677 P.2d 1070, 1073 (Ct.App.), *cert. denied*, 101 N.M. 11, 677 P.2d 624 (1984); *Bradfield*, 97 N.M. at 614, 642 P.2d at 217. Although we agree with HSD's premise that an unambiguous statute should be applied as written, *Johnson*, 105 N.M. at 566, 734 P.2d at 806, at the same time we agree with Mother that general rules of statutory interpretation require us to read Section 40–7–38 as a whole, with each section reconciled with the other sections, to effectuate the purpose of the legislation. *See In re Samantha D.*, 106 N.M. 184, 186, 740 P.2d 1168, 1170 (Ct.App.), *cert. denied* (August 14, 1987); *Mathieson v. Hubler*, 92 N.M. 381, 394, 588 P.2d 1056, 1069 (Ct.App.), *cert. denied*, 92 N.M. 353, 588 P.2d 554 (1978). Thus, it is clear that Section 40–7–38 in its entirety is intended both to protect the biological parent's rights and ensure that a parent consents with a full understanding of the consequences of relinquishing his or her child for adoption and to promote the best interests of the child by creating finality. Consent of the biological parent to the adoption of the child is at the foundation of adoption statutes. *Nevelos*, 65 N.M. at 254, 335 P.2d at 576. An involuntary consent cannot be considered valid. *See* § 40–7–38(A)(4). We conclude that, to give effect to this subsection, the children's court is required to determine at an evidentiary hearing whether the consent was obtained involuntarily, despite the court's initial certification of the consent document.

In our view, adopting HSD's narrow interpretation of Section 40–7–38 would mean promoting form over substance in that a consent that was apparently voluntary on the surface but in fact could be shown to be involuntary could not be withdrawn. We believe such an interpretation would be contrary to the legislature's intent to ensure that relinquishments of parental rights and consents to adoption were voluntarily made under the specific requirements of Section 40–7–38(A)(4). Here, although the formal requirements were met, there is an issue concerning whether the intent of Section 40–7–38(A)(4) was fulfilled if Mother's consent was given as the result of a threat. We believe that it would not promote the legislature's goals to accept HSD's argument that Mother's parental rights were fully protected when the children's court inquired of Mother concerning the "voluntariness" of her relinquishment and consent. If Stepfather had threatened and coerced Mother to relinquish her parental rights, it stands to reason that Mother would anticipate that the children's court's inquiries had to be answered so as to convince the court that nothing was amiss and that the consent was voluntarily signed. To do otherwise would only assure Mother that the threats would be carried out. Although allowing Mother the opportunity to present evidence on this issue could be viewed as "rewarding" Mother for her possible perjury, we believe the legislative intent of Section 40–7–38(A)(4) is best promoted by requiring an evidentiary hearing.

We also disagree with the dissent's implicit suggestion that our interpretation of Section 40–7–38 somehow expands the basis for withdrawal of a parent's consent. Such is not the case. Mother is simply attempting to withdraw a consent that she essentially alleges was invalid *ab initio* because involuntary and therefore not in compliance with Section 40–7–38(A)(4). *Cf. Doe*, 87 N.M. at 255, 531 P.2d at 1228 (circumstances alleged by mother were common to many adoption situations and hence did not show that her consent was involuntary). Allowing a hearing on the issue of whether Mother's consent was voluntary harmonizes Section 40–7–38(F) with Section 40–7–38(A)(4). Our holding is therefore intended to give meaningful effect to what we consider to be the legislative intent.

HSD contends that, even if duress can render a consent involuntary, the circumstances alleged by Mother as a matter of law do not rise to that level. In HSD's view, Mother "chose" to relinquish her parental rights to Kira and remain with Stepfather and her other child. Stepfather's threat, claims HSD, was not " 'sufficient to overcome the mind of a person of ordinary firmness.' " *See Barwin*, 62 N.M. at 198, 307 P.2d at 185. We disagree that the

circumstances alleged by Mother are akin to "duress of the circumstances" as a matter of law.

▇ Unlike the situation in *Doe*, the facts alleged by Mother are not necessarily circumstances common to many adoption situations. As noted earlier, a threat, such as that alleged by Mother, would probably not be revealed in the initial hearing because the threatened party would realize what answers should be given to achieve the result desired by the person making the threat. The public interest of ensuring that parents have voluntarily released their children for adoption will be promoted by allowing parents to show their consents were involuntary. This is particularly important where, as here, no other party has acted in reliance on the relinquishment and is attempting to adopt the child. In *Doe*, there was a greater interest in finality for the child because other parties were actively seeking to adopt the child involved and the biological parent was interfering in the adoption proceedings. *Doe*, 87 N.M. at 254, 531 P.2d at 1227. In this case, although HSD argues that Kira's current foster parent had indicated an interest in adopting Kira, no adoption petition has been filed. Mother in this appeal is not interfering with any adoption proceedings. *See generally* Gary D. Spivey, Annotation, *Right of Natural Parent to Withdraw Valid Consent to Adoption of Child*, 74 A.L.R.3d 421 § 22 (1976).

Additionally, although we see little uniformity in the case law from other jurisdictions, *see* Gary D. Spivey, Annotation, *What Constitutes "Duress" in Obtaining Parent's Consent to Adoption of Child or Surrender of Child to Adoption Agency*, 74 A.L.R.3d 527 (1976), we note that some courts have held that marital difficulties constitute duress that justifies a parent's withdrawal of a consent to adoption. *Id.* at 538–39. In our attempt to reach a correct disposition of the sensitive issue raised in this appeal, we reviewed numerous decisions from other jurisdictions on the subject. A review of those decisions left no doubt that there is a broad spectrum of divergent views by other tribunals. That

was not surprising, given the difficult nature of deciding issues that may play a part in determining the course of the lives of those persons who may be profoundly affected by the court's disposition. Although our research uncovered a few cases from other jurisdictions with somewhat similar or analogous facts, we came to the realization that, ultimately, our decision turned on the statutory construction and interpretation of only one statute, that enacted by our legislature. Our holding gives force to the legislative intent, which, in our view, was to protect and preserve the rights of both the parent and the child. Our decision carries out that mandate.

We thus determine that Mother has timely alleged facts sufficient to raise an issue concerning the voluntariness of her relinquishment of parental rights and consent to adoption. Because no evidence other than Mother's affidavit concerning whether Mother's free will was overborne was presented at the hearing below, we reverse the children's court's grant of summary judgment and remand for an evidentiary hearing on the voluntariness of Mother's consent. We believe that this issue is for the children's court to decide in the first instance. *See* NMSA 1978, § 40–7–49(D) (Repl.Pamp.1989).

▇ We observe, however, that even if the children's court determines that Mother's relinquishment of parental rights was involuntary and thus ineffective, the children's court properly has jurisdiction to determine who should have custody of Kira. *See Samantha D.*, 106 N.M. at 188, 740 P.2d at 1172. In making this determination, Kira's best interests are, of course, paramount. *See id.; see also Barwin*, 62 N.M. at 199, 307 P.2d at 185–86.

## CONCLUSION

We conclude that Mother has stated a claim sufficient to defeat a motion for summary judgment. We thus reverse and remand for an evidentiary hearing on the question of whether Mother's consent was involuntary.

**IT IS SO ORDERED.**

CHAVEZ, J., concurs.

BLACK, J. dissents.

BLACK, Judge (dissenting).

I do not disagree with the majority that the legislature intended to protect both the rights of the parents and the child in the relinquishment of parental rights. I also believe the legislature constructed a set of procedures to achieve that balancing and that those procedures were scrupulously complied with in this case. I must therefore respectfully dissent.

Prior to the judicial hearing on the relinquishment of parental rights, Mother received full and extensive counseling from a state social worker regarding her other alternatives. Indeed, the counseling narrative presented to the district court discusses at length how various issues were explored with Mother, including her full understanding of the meaning and consequences of voluntary relinquishment and exploration of any reasons this decision was not of her own free will. This is all that is required by NMSA 1978, Section 40–7–38(A)(4), (Repl.Pamp.1989). However, the report presented to the court also indicated that Mother told the social worker that she felt "strongly that it's best for Kira that she relinquish her parental rights" and "that she had been thinking about this decision for a couple of months." She further "stated that she has discussed her thoughts and decision with her attorney, her mother, *her husband,* and with Dr. Ken Williams during her psychological evaluation." (Emphasis added.) Mother's second husband, the person Mother now claims "coerced" her into relinquishing her parental relationship with Kira, was not even present at this counseling session. Rather, Mother was accompanied to this session by her mother (i.e., Kira's maternal grandmother).[1]

On November 15, 1991, three days after Mother's session with the state social worker, District Judge Jewell fully reviewed the proposed relinquishment at length with Mother, who appeared with her attorney. The most pertinent part of that colloquy follows:

JUDGE: [T]here's a four-page document here entitled, "Relinquishment Narrative." It indicates that on the 12th of this month, you were interviewed by the Human Services Department, and there are several questions which are responded to in writing here. The first one is, "Do you understand what voluntary relinquishment means and do you understand its consequences?"

Mother: Yes, I do.

JUDGE: You've in fact discussed this with the worker. You understand what "voluntary relinquishment" is, and you do understand the consequences of that?

Mother: Yes, Your Honor.

JUDGE: And are you making the decision to voluntarily relinquish of your own free will?

Mother: Yes, Your Honor.

JUDGE: No one is promising you anything as a result of that, or there've been no threats or ...

Mother: No.

JUDGE: ... coercions against you?

Mother: No, Sir.

At the conclusion of the extended dialogue Judge Jewell concluded, "The Court is satisfied that the relinquishment is voluntary, knowing and intelligent." Mother then signed the Relinquishment of Parental Rights and Consent to Adoption in front of the Judge.

On April 16, 1992, HSD filed its mandatory six-month review report with the district court. This report indicated that Kira had a "last session" with Mother on January 2, 1992, and was informed she would not be going "home" in the future.

After her separation from her second husband, and six months after her representations to Judge Jewell, Mother filed a

---

1. This would seem to contradict the majority's conclusion that the husband's threats of coercion would require her to lie convincingly to the district court "because the threatened party would realize what answers should be given to achieve the result desired by the person making the threat." [At 808]

motion to revoke her relinquishment of parental rights. HSD opposed the motion on the basis, *inter alia*, it would not be in the best interests of the child. Judge Jewell issued a "summary judgment" denying Mother's motion and further found it was in the best interests of Kira to remain in her specialized foster care [2] home with any adoption proceedings to be held in abeyance pending the outcome of this appeal.

Based on this record, I am obliged to conclude that both HSD and the district court strictly complied with all the requirements of Section 40–7–38(A). After such compliance, revocation of consent to termination of parental rights is controlled by statute and only authorized when "the consent or relinquishment was obtained by fraud." Section 40–7–38(F).

Initially, courts must determine the legislative intent from the language of the statute, and when the words are free from ambiguity and doubt, other methods of statutory construction are not necessary. *State ex rel. Stratton v. Roswell Indep. Schools,* 111 N.M. 495, 500, 806 P.2d 1085, 1090 (Ct.App.1991). I believe the language of Section 40–7–38(F) is quite clear in authorizing parental withdrawal of relinquishment and consent to adoption only when "the consent or relinquishment was obtained by fraud." Mother's motion to withdraw her consent in this case did not allege the consent was obtained by fraud.

In addition to the statute, I believe our opinion in *In re Adoption of Doe,* 87 N.M. 253, 531 P.2d 1226 (Ct.App.), *cert. denied,* 87 N.M. 239, 531 P.2d 1212 (1975), dictates affirmance of the district court decision in this case. The majority would limit *Doe* "to its facts." [At 806.] I find no significant distinction between the facts of *Doe* and those in the present case.

That the majority opinion acknowledges some degree of inconsistency with *Doe* seems implicit in its recognition of the "importance" of the dissent in *Doe.* The dissent in *Doe* would have Section 22–2–27(D) (predecessor to Section 40–7–38(F)) read

"as if the word 'valid' had been inserted before the word 'consent.'" [At 806.] Whatever the equity of that position, I do not believe we should read into a statute language which is not there, particularly when the statute makes sense as written. *See State v. Alderette,* 111 N.M. 297, 299, 804 P.2d 1116, 1118 (Ct.App.1990).

I think an interpretation of Section 40–7–38(F) which limits the basis for revocation of parental consent to cases where fraudulent inducement is alleged is consistent not only with the unambiguous statutory language, but its history as well. Since our decision in *Doe,* the legislature has expanded the provisions of Section 40–7–38. At the time of *Doe,* the requirement that consent could not be withdrawn applied only to consent to adoption; subsequently the legislature placed relinquishment of parental rights as well as consent to adoption within the fraud requirement. *Compare* NMSA 1953, § 22–2–27(D) (Supp.1973) *with* § 40–7–38(F). More importantly, the legislature added Section 40–7–38(A) which sets forth in detail what the relinquishment form must contain. Section 40–7–38(A)(5) requires notice to the parent "that the consent to or relinquishment for adoption cannot be withdrawn." In conformance with this requirement, Paragraph 7 of the Relinquishment of Parental Rights and Consent to Adoption form which Mother executed before Judge Jewell clearly states, "I understand that this document is final and binding and that I cannot revoke or withdraw it, nor can I later reclaim the child."

I am also of the opinion that the legislature's strict limitation of withdrawal of relinquishment to situations where such consent was obtained by fraud "makes sense as written." Professor Clark's observations on the revocation of consent to termination of parental rights provide a useful backdrop for consideration of the issue:

> Attempts to revoke consent to adoption have produced more litigation than any other aspect of consent. Two fac-

---

**2.** Special care foster parents are licensed foster parents who receive intensive, specialized training in order to provide substitute care for chil- dren with physical, behavioral, or psychological conditions which require specialized care.

tors may be responsible for this. One is the contemporary unwillingness to recognize that we all are and should be responsible for our decisions, that our actions have consequences which cannot be evaded. The other is the profound emotional bonds which prospective adoptive parents feel for the children placed with them for adoption, bonds which spring up with extraordinary quickness after the placement. It is not surprising that these psychological factors produce vigorously litigated conflicts even after some states have made serious and thoughtful efforts to avoid them.

2 Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 21.5, at 618 (1987) (footnote omitted). In other states where the legislature has also "made serious and thoughtful efforts" to limit such litigation, the courts have generally rejected attempts to expand the basis for withdrawal of consent. *See, e.g., In re Sarah K.,* 66 N.Y.2d 223, 496 N.Y.S.2d 384, 487 N.E.2d 241 (1985), *cert. denied,* 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986); *In re Parental Rights to TR,* 777 P.2d 1106 (Wyo.1989).

I believe Section 40–7–38 also protects an entity the majority has overlooked, an overburdened family court system. Section 40–7–38(A) indicates the legislature carefully considered the procedural steps most likely to insure that the relinquishment by the parents is voluntary. To require HSD and the children's court to scrupulously follow this procedure, and then allow a mother to claim the whole procedure was but a charade, makes a mockery of the statutorily mandated procedure. If the parent repeatedly represents that the relinquishment is voluntary and expressly denies coercion, how can the children's court judge determine if consent is truly voluntary?

The majority states repeatedly that no adoption petition had actually been filed. [At 515, 516, 519, 864 P.2d at 804, 805, 808] This ignores the fact that the district court had approved Kira's permanent plan calling for consideration of adoption by special foster parents and the interest already indicated by Kira's special foster mother in such an adoption. More importantly, the majority fails to indicate why a parent cannot allege the "constructive fraud" [At 517, 864 P.2d at 806] or any other legal challenge to "voluntary" consent after an adoption petition is filed. The majority concludes "that this issue is for the children's court to decide in the first instance" [At 519, 864 P.2d at 808] but recognizes that its requirement of a second hearing is "despite the court's initial certification of the consent document." [At 518, 864 P.2d at 807] I do not believe Section 40–7–38 evidences a legislative intent to burden the children's court with such potentially limitless proceedings.

Although it was not necessary for the majority to consider the issue, my disposition would require us to address Mother's constitutional attack on Section 40–7–38. Mother contends that if Section 40–7–38(F) allows withdrawal of consent only when induced by fraud, it violates due process. She argues that "due process may be violated by the involuntariness of a confession" and therefore that due process is violated if her consent was not voluntary. The key element to invalidating an involuntary confession, or indeed any other due process claim, is state action. *Colorado v. Connelly,* 479 U.S. 157, 165–67, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473 (1986). Mother alleges not that HSD or some judicial official coerced her, but that her second husband subjected her to duress. This factual allegation cannot support a due process claim. *See id.* Moreover, provisions which terminate parental rights with absolute finality do not violate due process merely because there is no right to later revoke inappropriate consent. *Kathy O. v. Counseling & Family Servs.,* 107 Ill.App.3d 920, 63 Ill.Dec. 764, 438 N.E.2d 695 (1982); *cf. In re Voyles,* 417 So.2d 497 (La.Ct.App.) (failure to revoke within statutory period not a due process violation), *cert. denied,* 420 So.2d 981 (La.1982); *In re Myers,* 131 Mich.App. 160, 345 N.W.2d 663 (1983) (same).

Procedural due process requires only notice and an opportunity to be heard by an impartial panel. *McCoy v. New Mexico Real Estate Comm'n,* 94 N.M. 602, 614

P.2d 14 (1980). Mother was provided not only a full and complete hearing, but also was given the benefit of extended counseling on her legal options and had the advice of her own attorney. Judge Jewell also considered briefs and held a hearing on Mother's motion to withdraw consent.

Mother's problem is that she now wishes to claim she committed perjury before Judge Jewell, and to be relieved of the resulting consequences. I do not think the legislature intended to provide such a remedy unless the consent was induced by fraud. The observations of the Texas Supreme Court in rejecting a constitutional challenge to their parental relinquishment procedure seem apropos:

> In this cause, Brown voluntarily executed the affidavit in question in the presence of two witnesses, before a notary. The affidavit clearly sets out she is relinquishing all parental rights, that suit will be filed to terminate her rights, that she will not be further informed about the suit, and that this act is irrevocable. Certainly this Court recognizes the parent-child relationship as a basic civil right due a high degree of protection. *In the Interest of G.M.*, 596 S.W.2d 846 (Tex. 1980). However, when a parent voluntarily terminates this parent-child bond, the best interests of the child become paramount. Once that child has been surrendered to a licensed agency for adoption, the safety, education, care and protection of the child, not the contentment or welfare of the parent, is of utmost importance. *Catholic Charities of the Diocese of Galveston, Inc. v. Harper*, 161 Tex. 21, 337 S.W.2d 111 (1960). Children voluntarily given up in compliance with the Family Code, as was done in this case, cannot be snapped back at the whim of the parent. By these provisions in the Family Code the Legislature was seeking some small amount of security and stability for children placed in this position.

*Brown v. McLennan County Children's Protective Servs.*, 627 S.W.2d 390, 393–94 (Tex.1982).

I believe the language of Section 40–7–38(F) is unambiguous and allows a parent to withdraw consent to termination of parental rights only when there are allegations the consent was obtained by fraud. No such claim is presented in this case, so I must therefore respectfully dissent.